ALBANY,
Feb. 1806.

J. & S. Watson
v.
Delafield.

# J. & S. Watson *against* Delafield.

*Amendment of special verdict.*
Where a fact at the trial of a cause, is not controverted nor litigated before the jury, the court will order a *venire de novo*, to ascertain such fact, unless the opposite party will consent to amend the *special verdict*, by inserting it ; it appearing to have been omitted by the counsel at the time, from a belief that it might be inserted when the special verdict was drawn up in form.

*Insurance.*
Where the assured had written four letters, by different conveyances, ordering insurance, one of which was on board the vessel in which the assured arrived, after a knowledge of the loss, at a port from

PENDLETON, in behalf of the defendant, moved for leave to amend the *special verdict* in this cause, by adding the following words, " that one of the letters ordering insurance to be effected, was put on board of a certain brig therein mentioned, called the *Friends*, at *Jamaica*," or that a *venire de novo* may issue, to ascertain that fact. He read an affidavit stating, that on a second trial of this cause in *April* last, the jury found the heads of a special verdict ; that two or three weeks after he received the draught of the special verdict, to which he proposed certain amendments, that were delivered to the plaintiffs a day or two after, believing it to be the practice, to insert in a special verdict, when drawn up in form, such facts as were proved by written evidence, and were uncontradicted ; that the fact now proposed to be inserted, appeared in the deposition of *Enoch Rust*, one of the witnesses, and also in the minutes of the judge who tried the cause, but the judge refused to allow the proposed amendment. The affidavit further stated, several circumstances to corroborate the truth of the fact, which he wished to have inserted in the special verdict.

To shew the authority and practice of courts, in amending special verdicts, the following cases were cited ; *Rees* v. *Morgan*, 3 *Durnford & East*, 750. *Petrie* v. *Hanney*, *ibid.* 659. *Doe ex dem. Church* v. *Perkins*, *ibid.* 750. *The King* v. *the Mayor &c. of Gravesend*, 7 *Durnf.* & *East*, 699. *Grant* v. *Astel*, *Doug.* 722. *Williams* v. *Breedon*, 1 *Bos.* & *Pull.* 330. *Skutt* v. *Woodward*, 1 *H.* which the letter is sent by mail, he is bound to communicate the news of the loss immediately, or by the same post, so that the insurance may be countermanded.

*Blacks.* 238. 7 *Bac. Ab. Tit. verdict. (D.) Gwillim's Edition.* It was contended, that *Rust's* evidence was not discredited at this trial, and that, on the former trial the fact was conceded, and seemed, indeed, to be necessarily implied from what was found by the jury.

ALBANY,
Feb. 1806.

J. & S. Watson
v.
Delafield.

*Riggs* and *Radcliff* for the plaintiff, admitted that the witness did, in his deposition, swear to the fact which the defendant's counsel, now wished to have inserted in the special verdict, but they denied the truth of the fact, and insisted that the jury, by not finding it, had by their silence, negatived its truth; that the counsel for the defendant drew up the heads of the special verdict, and if they had omitted to insert this fact, it must be imputed to their own negligence; it was now too late to supply it. The present application is irregular, and ought not to be sustained, for it is substantially a motion for a new trial. A *venire de novo* is never granted in a case like the present.*

*Harison*, in reply. The present question is of great importance, as it involves a principle not yet decided, as to the power of the court over trials by jury. If the court can never interpose in such cases, the most dangerous consequences are to be apprehended from the practice of finding special verdicts. They furnish a convenient and easy method, by which juries may indulge their prejudices, or evade their duty with impunity, for since the abolition of *attaints*, the court would have no power over them. The salutary, and highly necessary power, of granting new trials would be defeated, if juries might, whenever they thought fit, find special verdicts, without any possibility of correction or controul.

The fact proposed to be inserted in the verdict, was one which the counsel in his affidavit, supposed to be uncontroverted, and which could be afterwards added. There was no evidence before the jury, to justify them in disbelieving the testimony of *Rust*. If they intended by their verdict, to shew their disbelief of this fact, they must have acted arbitrarily, as there was nothing to warrant such a conclusion.

He spoke in very forcible terms against the abuses, which

* See. 2 D. & E. 125 & 126 and *the note*, in what cases the court will award a *venire de novo*.

ALBANY,
Feb. 1806.

J. & S. Watson
v.
Delafield.

might result from the practice of allowing juries to find special verdicts, according to their own pleasure or caprice.

*Per Curiam.* We are satisfied, that the jury never considered this fact as ligitated, and that the counsel for the defendant, took it for granted, that it would be inserted in the special verdict of course, as an unqestionable fact. It would be unjust, therefore, to deprive the party of the means of ascertaining whether or not the jury did find it. We are of opinion, therefore, that a *venire de novo*, should be awarded, to try the single fact now in question.

On the next day, the counsel for the plaintiff, consented to insert the fact above stated, in the special verdict, and the cause was then argued on the verdict as amended.

The cause was tried at the *New-York* sittings *April*, 1805, before Mr. Justice *Thompson*.

From the peculiar circumstances, as well as importance of this cause, it may be proper to state the facts found by the special verdict.

The policy, interest, loss and abandonment, were proved on the trial. The policy in question, was effected by the plaintiffs, on the 12th *October*, 1801, pursuant to an order from *Henry Stouffer* of *Baltimore*, contained in a letter, written the 8th *October* and addressed to them as his agents, on 850 *doubloons*, equal to 13,600 dollars, on board of the Schooner *Harriet & Ann*, from *Jamaica* to *Baltimore*. The vessel sailed from *Kingston* on the 26 *August*, 1801, on the voyage insured, in all respects sea-worthy, with the property insured on board, which belonged to *Henry Stouffer* and *Andreas Finkin*, for whose account the insurance was made. The *doubloons* were neutral property, and continued on board until the 11th *September*, 1801, when they were lost in the vessel, which foundered and sunk by the perils of the sea. Before the vessel sailed from *Jamaica*, *Finkin* wrote four letters dated at *Kingston*, the 16th *August*, 1801, of the same tenor and date, directed to the said *Henry Stouffer* of *Baltimore*, advising him of the intended shipment of the *doubloons*, and directing insurance to be made. The letters were sent by different conveyances, to the United

ALBANY,
Feb. 1806.

J. & S. Watson
v.
Delafield.

States; one of them was put into the post-office at *Norfolk*, in *Virginia* on the 1st *October*, 1801 ; another of the letters had the post mark of " *Charleston, S. Carolina* ;" another, on which the post mark was illegible, except "19 cents," and the other marked, " *ship* 6 cents," were all received, at the compting-house of the said *Stouffer*, at *Baltimore*, at the same time, on the 7th *October*, and were all actually delivered to him, on the 7th or 8th day of *October* ; at that time, he knew nothing of the loss of the vessel, and was not informed of it, until the 14th day of the same month.

*Finkin* was on board of the vessel on her voyage, and, at the time she foundered, went on board the brig *Lucy*, bound to *Boston*, and continued until the 29th *September*, when he was put on board of the brig *Friends*, of *New-York*, then going into *Norfolk* in distress. One of the letters ordering insurance to be effected, was put on board of the *Friends* at *Jamaica*. The *Friends* arrived at *Hampton Roads*, on the 30th *September* ; *Finkin* remained at *Norfolk* 7 or 8 days, but owing to contrary winds, no packets sailed from thence, for Baltimore ; he was sick most of the time he was at *Norfolk*, and did not go ashore until the 6th of *October*. He was a *Danish* burgher, and it did not appear, that he had ever been in *Norfolk* before ; he had sailed out of *Baltimore* in 1799, but there was no evidence that he had been a resident there.

While *Finkin* was at *Norfolk*, he wrote a letter, dated the 1st *October*, 1801, addressed to a person in *Boston*, but there was no evidence that the letter had been sent by mail. *Rhodes* the master of the *Friends*, went by water, from *Norfolk* to *Baltimore*, and arrived at *Fell's Point* the 12th *October*, and on the same day wrote a letter to *Henry Stouffer*, informing him of the loss of the schooner and the *doubloons*, which letter was received by *Stouffer*, on the 14th day of the same month. The vessel in which *Finkin* and *Rhodes* went from *Norfolk* to *Fell's Point*, was prevented by the quarantine regulations, from going up to the city of *Baltimore* on her arrival. *Norfolk* is a regu-

lar post town, and the mail is seven days in going from thence to *Baltimore*. The bill of lading of the property was filled up in the *English* language, in the hand-writing of *Finkin*, who, while he was at *Norfolk*, wrote a letter addressed to Captain *Rust* of *Boston*, dated the 6th *October*, 1801, which had the post mark of that day ; he mentioned his having written before, to another person in *Boston*, that he had forgotten the money he put into the hands of Captain *Rust*, when he left the vessel, which was in *doubloons*, and requested it might be forwarded to Mr. *Stouffer*. · It appeared also, that *Rhodes*, the master of the *Friends*, went on shore at *Norfolk*, on the 30th *September*, and made his protest before a Notary Public of that place.

· This cause had been tried before, and on the motion for a new trial, the points of law were fully argued by the counsel. See 2 *Caines* 224.

*Radcliff* for plaintiff, (*Hoffman* and *Riggs* on the same side) contended, that several new facts appeared in the case now before the court, which rendered it, in several important particulars, different from the one presented on the former argument for a new trial. He admitted, that where an order of insurance is given, and immediately after the party receives news of the loss, and does not countermand the order, such conduct must be considered as evidence of fraud. But here *Finkin* was perfectly innocent. He knew nothing of the arrival of the order, nor of that given by *Stouffer* for the insurance. No fraud or negligence, can fairly be imputed to him. When he arrived at *Norfolk*, and during his stay there, he was sick, a stranger, and ignorant of all those circumstances, the knowledge of which might be deemed as evidence of a fraudulent inaction. It may be said so far, as the insurance is to be presumed to have been made on the order sent by the *Friends*, it must be considered as fraudulent ; but if that letter had been stopped, it could not have made any difference, as all the letters were actually received at the same time.

*Harison* contra, (*Pendleton* on the same side.) It is attempted to shew, that the case now before the court, is materially different from that presented on a former occa-

ALBANY,
Feb. 1806.

J. & S. Watson
v.
Delafield.

sion; but if perused with attention, its features will be found essentially the same. No fact appears, which can possibly induce the court, to alter the opinion they have before expressed. It is found, that four letters, instead of three, were sent, directing the insurance to be made. This circumstance did not vary the case, for if *Finkin* knew that any one of them had not arrived, his duty was precisely the same. Whether the vessel arrived at *Hampton Roads*, or *Norfolk*, did not vary the merits of the case; and whether *Finkin* went on shore or not at *Norfolk*, was perfectly immaterial, if he was able to write a letter. The sickness which is alleged, as an excuse for his not writing to give information of the loss, can be of no avail. He was well enough to write two letters to *Boston*, and could have written to *New-York* and *Baltimore*. To render it a sufficient excuse, his sickness should have been so severe, as totally to incapacitate him from doing business. He cannot allege his ignorance of mails and post days, or that he had no opportunity to send a letter, for the captain went on shore the 30th *September*, and he might have sent his letter by him, to be forwarded. In short, it will be found, that the facts in the present verdict, are the same as those stated in the former case, and that the new circumstances which appear, are wholly immaterial. It is said that the opinion before given by the court, goes much further, than any case decided in the courts of *Great Britain*.* I think not, for here is that *crassa negligentia*, that gross neglect in the party, which has the same effect as fraud. It was the duty of *Finkin*, knowing of the letters sent by him, directing the insurance, to have written immediately on his arrival, to *Stouffer*, to inform him of the loss. The insurers ought not to be made answerable for his supineness, or neglect.

*Per Curiam.* This special verdict, presents nothing to induce us to change the opinion, we have before given in this cause. The additional facts, or circumstances, which it contains, do not in any degree, vary the merits of the case. We shall therefore, adhere to our former decision.

Judgment for the defendant.

* *Grieve v. Young, Millar* 65. *Fitzherbert v. Mather*, 1 D. & E. 12. See also *Guidon 4. Marine Ord. of France.* Art. 38. 39—2 *Emerigon*, 157. *Pothier Pass. Art.* 1. § 242.