Livingston, J.
delivered the opinion of the court. It is contended on the part of the defendant, either that Stouffer, when he gave the order for insurance, knew of the loss of the Harriet and Ann, (in which case the policy would certainly be void) or that Finkin might, and ought to, have communicated to his partner information of the accident, immediately after his arrival at Norfolk, because this would have prevented the insurance, and that his neglecting so to do was a constructive, or *a positive’ fraud, either of which will equally vacate the insurance.
As to the first allegation, that Stouffer knew of the loss when he wrote his letter of the 8th October, 1801, we are all satisfied that it is unsupported by any testimony whatever. There can be no doubt that he had no intelligence of the misfortune until the 14th of that month, and that he acted with perfect good faith in ordering the insurance. There is no room, therefore, to impute to him fraud or impropriety. Were the cause relieved from every embarrassment but what arises from his agency, we should, without difficulty or hesitation, say that justice has been done, and refuse a new trial. The conduct of his partner, however, is not so free from exception. If it has' not been such as *229 the defendant had a right to expect, or the rules of law imposed, not,only be, but all those concerned with him, and who are of course answerable for his acts or negligence, must suffer. The case, as it respects the behaviour oí Fin-kin, is not without difficulty. If his letters of the 16th August, directing insurance, were written in good faith, and sent in season, he might suppose that as he had fairly run the risk of paying a premium, it was not incumbent on him, even after a loss, to take any step to his own prejudice. In this view of the subject, perhaps no actual fraud is to be imputed to him; nor do we mean to say that in all cases whatever, it is the duty of a party who has directed an insurance to send immediate notice to his agent of every disaster which happens with a view of defeating orders given in sincerity, merely because it is possible thb countermand may arrive in season. That question is not now before us, and when it occurs will require very serious deliberation. We are now called on to say whether, if a person, having sent orders to insure from a foreign country, shall afterwards'arrive in the neighbourhood of the port to which his letters are transmitted, and on .board of a vessel in which he knew one of them to be, under apprehensions also of insurance not being effected, he be not bound to give his agent information of a loss by the same mail which he must have known would carry his letter ?
The counsel for the defendant have referred us to the 38th article of the celebrated “ ordonnance de la marine” of Louis XIV. to Pothiér on Insurance, c. 1, s. 24, to Valin, vol. 2, 94, to 2 Emerigon, 137, and to Le Guidon, c. 4.
This article of the ordinance which has been cited “ annuls *all insurances made after the loss, or or arrival of the property assured, if the assured knew or might have known of the former, or the assurer of the latter, before the signature of the policy,” The ordinance then defines what shall amount to presumptive evidence of such knowledge; but, without investigating the propriety of this regulation, it is sufficient to say that *230 this rule, in the extent bere prescribed, bas not been adopted either in England or in this country. It is not sufficient that the assured might have known of the loss. It must be proved that be did know it: and in many cases he may even know of the loss at the time of subscribing the policy, and yet the insurance be valid; as in the present case, if the policy bad been subscribed on the 30th of September, 1801, it would have been effectual, although Einkin then knew of the loss. But little light, therefore, will be reflected on the present question, either from this ordinance or the commentaries on it. Emerigon, it is true, in treating of insurances made by agents, (vol. 2, p, 148,) declares a policy void, “ if the principal, being informed in time of an accident, do not revoke his order.” In conformity with this principle we find a decision in the court of session, in Scotland, reported by Millar, p. 65. It is the case of Greive against .Young. On the 10th of December, 1799, Greive wrote to his correspondent in Edinburgh to insure his vessel. This letter was sent on the evening of the 10th to the Press, five miles off, on the London road, where it would be taken up by the post early the next morning. The letter arrived at Edinburgh about six o’clock in the afternoon of the lltb, and insurance was effected. At ten o’clock on the morning of the 11th, the ship sunk in the sight of Greive. The post left the Press usually before seven in the morning, but oftentimes as late as nine, ten or eleven, and sometimes, though seldom, not before one or two in the afternoon. On the 11th of December the post did not leave it till near ten. It was determined that Grieve ought, by express, to have informed his correspondent at Edinburgh of the disaster, to prevent insurance, as he had reason to think an express would have reached Edinburgh in time for that purpose. The cause being removed into the court of session, they thought it was not incumbent on Greive to send an express, but being satisfied that he had time to countermand the insurance iq the ordinary course of the post, and that it was his duty tc have done so, judgment was given for the underwriters.
In the case of Fitzherbert v. Mather, in the king’s bench *of England, an insurance was held not recoverable because the agent of the assured, who had written him a letter, on the 16th September, 1782, informing him of the sailing of a vessel in which he had shipped certain property on his account, on which letter insurance was effected, neglected to send him information of her loss, which came to his knowledge the next morning. “ The agent,” says Lord Mansñeld, in delivering his opinion in this cause, “ acted honestly when he wrote the let ter; but on the 16th, at night, he heard the ship was on shore, and the next morning he knew that she was lost. The post did not go out till the afternoon of that day, therefore he had full opportunity to send an account of the loss.” This last decision, it must be confessed, bore extremely hard on the assured, because Thomas, being his agent only for the purpose of making the shipment, it might well bo supposed, by himself and others, that his agency ceased as soon as the goods were on board, and he had sent on the invoice and bill of lading. It proceeds, however, as well as the case from Mil 1 ar, on the principle relied on by the defendant, that orders for insurance must be revoked, after a loss, where there isa probability the revocation will arrive in time. Nor will this appear unreasonable, when we recollect how much an underwriter is in the merchant’s power. lie may lose the chance of insuring, not only by hearing himself of the safe arrival of the property, but, is exposed to every possible diligence and activity, which interest will inspire, and which, of course, will be exerted by the other party to prevent an insurance in "such an event. Not only the mail, but expresses, will be resorted to, tc convey the important intelligence. If, then, a person be permitted, in this way, to prevent an insurance, or an order given, in good faith, and thus deprive the assurer of a premium, there is no hardship in imposing on him a rea *231 sonable diligence, in communicating a disaster, so long as sucb information may very probably be expected to arrive in time. He should not be allowed to be active to save a premium, and passive in obtaining an indemnity against a loss, which has happened early enough tobe communicated, by ordinary diligence, to the underwriter. If, in the present case the Harriet and Ann had arrived safe at Norfolk on the same day with the friends, no one can doubt that Mr. Finkin would have tried to stop his letter in transitu, or would immediately have despatched an express to Baltimore or at least have written by *the first mail; in which case, insurance would not have been made. This arriving in a vessel on board of which was one of his letters directing insurance, and, under apprehensions that none was effected, are circumstances which have very great influence on our decision. He had reason to believe, when he arrived at Norfolk, that no insurance was made, and must therefore have known that it was in his power to prevent it. It cannot be believed he was unable to get a letter into the post-office, at that place, and still less, that he was ignorant that his letter to Mr. Stouffer, which was on board the Friends, would be lodged there by the captain. There is something said of his being sick part of the time, but it will be remembered, that on the 1st of October, he wrote to Mr. Merry, and on the 16th, he was on shore. It was as easy to write to Mr. Stouffer as to Mr. Merry, and if too unwell to go on shore, he might easily have sent it to the post-office. It is not very clear that he might not have obtained from the captain of the Friends possession of his own letter to his partner, if he had asked for it. Perhaps, however, this could not be done, as masters, who arrive in the United States, are, by law, to deliver to the postmaster all letters which are brought in their vessels. Be this as it may, Finkin must either be presumed conusant of the law on this subject, in which case he would know that his letter would be put in the post-office, or he must have in *232 quired of the captain what would be done with it, who would have given him this information. His permitting this letter, then, to go forward, under circumstances of this na ture, without taking any one step to counteract its effect, must be deemed, if not a misrepresentation, at least so gross a neglect as to vacate the contract altogether. His silence and inactivity could hardly have been accidental. A designing man would reason, as it is too probable he did, “My other letters may not yet have reached Baltimore; my only hope, therefore, is on the one which will be forwarded by the Captain of the Friends; I will, then, let this go on and say nothing of the accident until it has been acted on.” Such reasoning cannot be endured. It will not help the plaintiff, to say that the other letters, or one of them, might have come to hand. To this an answer has already been given. Mr. Finkin himself thought otherwise, and, at any rate, it was no excuse for letting a letter go on uncontradicted, after the loss was known. If the other letters had miscarried, the insurance *would have been effected on the one thus improperly forwarded. Another answer is, that as this letter did go on, ho should at least have given the underwriters, who were so much in his power, a chance of receiving timely information of the loss. Had this been done and insurance affected on either of the other letters, all would have been safe. The principle of the decisions, which have been cited, and which we here adopt, will prevent frauds, will place the assurer on a more equal footing with the merchant, will produce good faith in transactions of this nature, and not leave it in the power of a crafty or designing man, to make his own advantage, to the prejudice of a third person, of every circumstance which may happen, be it disastrous or otherwise. Upon the whole, therefore, after mature deliberation, we think the judge who tried this cause was mistaken in his charge, and that it was, under all the circumstances of this case, incumbent on Finkin to have written to his partner, apprizing him of *233 tbe loss of tbe Harriet and Ann, and that, not baying done so, a new trial must be granted, with costs to abide tbe event of tbe suit.(a)
New trial.

 See this case, 1 Johns. Rep. 150, and the special verdict on the new trial granted in the text, upon which the court ordered judgment for th« defendant.