## T. B. GRAHAM *v.* GENERAL MUTUAL INSURANCE COMPANY.

This case was submitted to a jury without argument of counsel.   Upon the jury returning and requesting argument, it was agreed the case should be argued on the following morning.   On that morning, one of the counsel of record for the plaintiff fell sick.   Another counsel for the plaintiff was present, who moved the postponement of the trial on account of the absence of his associate counsel.   It being the last day of the jury term, the court refused the postponement and the case was left with the jury.   *Held:* There was no error in the refusal of the court to postpone the trial on account of the absence of one counsel, when another, on the same side, was present.

Where a party effecting an insurance upon a vessel had heard a rumor that the vessel was lost, he is bound to communicate the rumor to the insurance office, although he may have had doubts as to the truth of the report.

APPEAL from the Fourth District Court of New Orleans, *Strawbridge*, J.   *Winthrop*, for plaintiff.   *E. Briggs*, for defendants.   The judgment of the court was pronounced by

SLIDELL, J.   This action is upon a policy of insurance for $4300 on merchandise per flatboat, *Williams*, master, from Smithland to Natchez.   The defendants pleaded the general issue, misrepresentation and concealment.   The cause was tried before a jury, who rendered a verdict in favor of the defendant.

The plaintiff moved for a new trial, which was refused by the district judge, and the plaintiff appealed.

The counsel for the plaintiff has not entered into argument here upon the evidence in the cause, but has rested upon the alleged right to have the cause remanded upon two of the grounds urged in the court below for a new trial, to wit: "That evidence was allowed to go to the jury which had been rejected by the court; that the cause was improperly allowed to go to the jury without argument, when the jury having returned into court after the cause had been submitted, requested argument, and when the counsel had agreed to argue the cause under the direction of the court on the following morning, the counsel for plaintiff having been in the mean time taken sick and confined to his house, and the court having refused to allow the argument to be postponed, when application was duly made for that purpose."

The counsel for the defendants assert, that the whole of the testimony was submitted, subject to the objections taken by plaintiff as to that part of it which was hearsay; and that the want of form as to the execution of the commission was waived on both sides, upon the defendants agreeing to admit in evidence an unsworn written statement of *Shelmire*, the deceased agent of the plaintiff.

It is to be regretted that counsel differ so materially in their recollection, and if there was an agreement, that it had not been reduced to writing. In the absence of any written agreement, we must look to the transcript alone to ascertain what evidence was before the jury.

It appears, from the statement of evidence made by the clerk at the trial, that the defendants introduced in evidence the return of a commission which contained, among other testimony, that of *Gaw*, *Sparks* and *Baldwin*. In over-ruling the application for a new trial, the district judge gave a written opinion. In this he states as follows: "It is proper also to mention that the testimony of three witnesses, to wit, *Gaw*, *Sparks* and *Baldwin*, taken under a commission, and which have been rejected by the court, on the ground that their names had not been inserted in the commission, was allowed to go to the jury without any instructions from the court; [ in this the court had no agency, and had rejected their depositions; ] and that the hearsay testimony of other witnesses rejected by the court had also been allowed to go to the jury under similar circumstances. The court directed the jury that the hearsay testimony must be disregarded by them—all the papers in the cause having been indiscriminately bundled together by the clerk and placed in the hands of the foreman." It will be observed, that the judge says the depositions were allowed to go to the jury; and as he disclaims any responsibility upon that score, it may be inferred from the language used, that the plaintiff was aware of what took place, and made no objection to it. If we infer, from all the circumstances, that the plaintiff, after his objection to the admission of the testimony of the three witnesses had been sustained, subsequently waived it, the statement of evidence made by the clerk, whose duty it was to make it, and the statement of the judge will harmonize. Such probably was the real course of the trial.

The refusal of the court to keep the jury together, when the last day of the jury term had arrived, and order their attendance to hear argument at a future day, when he thought he would not be able to collect them again, was not erroneous. The parties had previously submitted the cause without argument. When the jury returned into court, one of the plaintiff's counsel of record was present, and might have argued the case. The other counsel had been present with his associate during the trial, and was taken sick after the submission of the

GRAHAM
*v.*
GEN'L MUTUAL
INSURANCE
COMPANY.

cause to the jury. Even on an application for a continuance before trial, a refusal of the judge below to postpone a trial on account of the absence of one counsel, where other counsel was present, would not be disturbed by this court.

The court had directed the jurors to disregard such portions of the depositions as were hearsay; and it is evident that the district judge was satisfied that the jury understood and followed his instructions. The only juror who was examined on the hearing of the motion for a new trial states, that his verdict was based upon the testimony of the two brothers *Falls*, to which there was no legal objection; that great weight was given to it by the other jurors; that he, himself, considered that no weight should be given to hearsay testimony, but was unable to say whether his fellow-jurors so acted or not.

Looking therefore at the mere question of alleged irregularity, we would not be disposed to say that a case is presented which would authorize us to disregard the opinion of the district judge, and grant a new trial, which he refused.

But without putting the matter upon this ground, there is another and broader ground upon which the refusal of a new trial should be approved by this court. It is, that if the testimony of the three witnesses, which was said to have gone before the jury irregularly, and all the testimony objectionable as hearsay be stricken from the cause, the remaining evidence is abundantly sufficient to sustain the verdict, and satisfy the mind, beyond question, that the plaintiff's claim has no foundation in justice. We are inclined to think that, even in a court of common law, a new trial would not have been granted under such circumstances, if the whole testimony was in writing, and could be fully reviewed on the motion for a new trial. But we have no hesitation in saying that it ought to be refused here, considering our system of practice and the jurisdiction of this court. As was observed in *Flower* v. *Jones*, 7 N. S. 148, we sit not merely as a court for the correction of errors in law, but with the power to revise the conclusion drawn by the inferior tribunal from the facts. Here the whole of the evidence comes up, and is spread before us for our judgment. We have the means of judging whether any misdirection or irregularity on the trial of a cause could have embarrassed the jury in their search for the truth; and whether or not substantial justice has clearly been done. We have even the power to set aside a verdict, and give such judgment as in our opinion should have been given in the court below. We, therefore, will briefly consider that portion of the evidence which is entirely untouched by the above mentioned objections, laying the residue out of view.

The following facts are established beyond dispute: Two flatboats laden with merchandise belonging to the plaintiff, one of which was commanded by *Captain Williams*, left port in Indiana in company on the 5th February, 1846. On the 16th February, the one commanded by *Williams* struck on a snag in the Mississippi river, near Island 13, and was wrecked. A portion of the cargo was saved. Some of it was sold in a damaged condition along the river by the plaintiff's agent; and a portion, by various conveyances, reached New Orleans, and was received on the 16th March by the plaintiff's factors, *Shelmire & Co.* On the 10th March, *Shelmire* (the plaintiff himself being also in New Orleans) applied at one or two New Orleans offices to obtain insurances on the cargoes of the flatboats. The offices had demanded twenty or twenty-five per cent premium. *Graham* directed *Shelmire* not to give any such premium. He then applied to *Adams*, the agent of another insurance company. *Adams* made inquiries of *Shelmire*, and from the representations made to him rejected the risk, and told him that he did not think he could obtain insurance at any office in the city upon

like communications. On the same day, being the 10th of March, *Shelmire* obtained the policy from the defendants at a premium of two and a half per cent. The other flatboat, whose cargo was insured at the same time in the same office, reached Natchez in safety on the 10th March.

The following is a summary of the testimony of *Cregier*, *Wilson*, *Teaford* and *Earhart*, the plaintiff's own witnesses. They were examined by him under commission; and their testimony was offered by himself at the trial. In the early part of March, 1846, the plaintiff came to Natchez. He was there not less than six or more than ten days. His object was to await there the arrival of his flatboats. On the second day after his arrival, he expressed anxiety to one of those persons, *Earhart*, about the detention of his boats, and said he thought they had time to reach Natchez. *Earhart* asked him if he was insured; he said he was not, and had not been in the habit of insuring his boats; that he had confidence in the men, and did not apprehend any danger, unless they had encountered bad weather. That he had never lost a boat. In that, or a subsequent conversation, the witness advised him to insure; upon which he inquired where the insurance office at Natchez was to be found and about the rates.

*Wilson* testified that on the Saturday previous to *Graham's* departure for New Orleans, (which took place on Monday, the 9th March, at 2 A. M.) he had a conversation with the plaintiff, at the Natchez landing, relative to his flatboats which he said he had been expecting at Natchez, and thought they had been out much longer than they ought to have been. He expressed an anxiety to get the boats insured, and asked the witness if he would go with him to the insurance office at Natchez on the following Monday; which the witness said he would do.

*Teaford* testified that the plaintiff left Natchez in the steamer Jamestown, at 2 A. M. on Monday, the 9th March, 1846, and that some few days before his departure he appeared, from his conversation, to consider his boats behind their time. The witness heard at Natchez of the loss of the flatboat, on the morning of Monday, the 9th of March, between the hours of seven and ten.

*Cregier* testified that he heard the plaintiff say in conversation at Natchez, a day or two before his departure for New Orleans, that he felt some uneasiness about his boats, which he thought had been out an unreasonable length of time.

*A. Falls*, a witness for the defendants, testified that on or about the 8th of March, and as he thinks on Sunday, he met the plaintiff on the wharf at Natchez, who said he had heard there was a flatboat lost on the river. Witness told him he had heard of it, and that it was supposed to be *Graham's* boat; that it was stove at some place near Island 13, on the Mississippi. The witness told *Graham* that he had his information from one *Brown*, who was steersman of a boat from Illinois, and suggested to *Graham* to go to the witness' boat then at the Natchez landing, and see the witness' brother, who could probably give him better information.

*J. M. Falls*, also a witness for defendants, testified that the plaintiff came on board of a flatboat owned by himself and his brother, at Natchez, on or about the 8th March, 1846, and inquired of the witness if he had heard of the loss of a boat, and whose it was. The witness told him he had heard from *Brown*, the steersman of a boat from Illinois, that there was a boat from Washington, Indiana, at Island No. 13; and that *Brown*, upon being asked by him if it was *Graham* and *Hyatt's* boat, said it was *Graham's* boat. *Graham* said that *Hyatt* had a boat on the river that was loaded with pork and wheat, and he did not think that the wrecked boat was his, but entertained a hope that it was not his.

GRAHAM
v.
GEN'L MUTUAL
INSURANCE
COMPANY.

There is other testimony of like tendency, but which we deem it unnecessary to notice in detail.

We consider the evidence as establishing conclusively not only the belief of *Graham* that the boat was out of time, but that he had reasonable ground to believe that it was wrecked, when he came to New Orleans and directed his agent to effect insurance.

There is in the transcript a written statement, not under oath, prepared by *Shelmire*, which he handed to plaintiff's counsel for his guidance, and as the testimony which he would give at the trial. Its effect must have been gravely impaired by the opposing testimony of another witness, the agent of the defendants. *Shelmire*, in his statement, says that he informed this agent that the boats had been out since the 13th of February from Smithland. The agent of the underwriters testifies that that fact was not disclosed, and that from the statements of *Shelmire*, he believed the boat was not out of time. The fact that the defendants took the risk at a premium of two and a half per cent, is a very strong circumstances in corroboration of the agent's testimony.

But, at any rate, *Shelmire* does not say that the plaintiff had told him the rumour of the boat's loss, and that he communicated that fact to the underwriter.

From the above evidence it is clear, that there was, on the part of the plaintiff, a concealment of material facts; and consequently the policy must be declared void. See *DeCosta* v. *Scandret*, 2 P. Williams, 170. 2 Emerigon, 124. *Lynch* v. *Durnsford*, 14 East, 494. 2 Duer, 391, 410. 3 Kent, 285. *Watson* v. *Delafield*, 2 Caines, 224. 1 Arnould, 537. *McClanahan* v. *Universal Insurance Company*, 1 Peters, 170.

But even if the plaintiff really entertained doubts whether the wreck reported was that of his own boat, it was still his duty to disclose the rumor to his agent, and direct him to communicate it to the underwriter. Marine insurance is a contract *uberrima fides*. "It abhors deceit, dissimulation, evasion. It condemns alike the suppression of truth, and the assertion of falsehood." Hence it is well settled that the assured is bound to disclose all the intelligence which he has received that relates to facts which are material to the risk, and which would reasonably influence the judgment of the underwriter, although the intelligence may be of a doubtful character.

Judgment affirmed, with costs.