Ambrose Snow et al., Respondents, *v.* The Mercantile Mutual Insurance Company, Appellant.

Where a person who has directed a marine insurance to be procured at a distant place receives intelligence of a loss before his order is executed, it is his duty to transmit the intelligence, or to countermand the order, by the earliest and most expeditious *usual* route of mercantile communication ; a failure to resort to an unusual and extraordinary mode of conveyance will not vitiate a policy obtained in pursuance of the order, although the information might have thus been conveyed before the policy was effected.

As to whether a particular mode of communication is the usual one, is a question of fact.

In an action upon a policy obtained in New York, in November, 1866, in pursuance of an order sent from L., it appeared that the loss was known to the owner, and intelligence thereof could have been sent by ocean telegraph before the insurance was procured. Notice was sent by the first mail. It was stipulated upon the trial that such telegraph was then "used by merchants and others whenever, in their judgment, the interests of their business required the necessary expense." It had been in operation between L. and N. Y. for about three months. At the time, rates were high, and the messages both ways averaged but about twenty-nine per day. *Held* (Reynolds and Gray, CC., dissenting), that the facts would not have justified a finding that the telegraph was the usual mode of communication; and that a direction to the jury to render a verdict for plaintiff was proper.

(Argued May 22, 1874 ; decided September term, 1874.)

Appeal from judgment of the General Term of the Supreme Court, in the second judicial department, affirming a judgment entered at the Circuit.

This action was brought upon a policy of marine insurance.

At the trial certain facts were admitted by the parties for the purposes of the action, in substance as follows :

On October 25, 1866, William Fry Angell was the owner of an insurable interest in the ship Sunda, which was then lying in the port of Liverpool, and was perfectly seaworthy. Angell requested his broker in Liverpool (one Gilchrist) to write to the plaintiffs in the city of New York, to effect an insurance on the ship in a marine insurance company. In

accordance with this direction, Gilchrist on October 27, 1866, wrote to the plaintiffs requesting them to effect an insurance, describing the ship, and stating that she was loaded for Aden, and that she would probably be out of the channel before the letter was received. This letter was received by the plaintiffs on November 8, 1866, in due course of mail by ocean steamship. On the ninth day of November the plaintiffs effected an insurance for one year from that date with the defendants, for $5,000. On October twenty-ninth, the ship sailed from Liverpool on a voyage to Aden, and while proceeding to sea was wrecked and lost on the English coast. The loss was known to Angell as early as October 30, 1866. The value of the ship exceeded $5,000. On the thirty-first day of October Gilchrist, as the agent of Angell, wrote by the first mail to the United States after the loss of the ship, the following letter, received by them November thirteenth, in due course of mail.

"I wrote you on the twenty-seventh instant *per* Java as per copy annexed, and am sorry now to inform you that said ship was a total loss on Monday the twenty-ninth instant. She was in tow of a steamer with a pilot on board, and when she had reached the Queen's channel struck on the bar, where she remained until low water, and then fell over on her beam ends, and heavy gale coming on at the time with heavy sea, which caused her to become a total wreck. * * * Probably you may hear of this by telegram before you receive my letter, but if you do not, and have the insurance effected, I suppose it will be all right, as the owner has nothing more on the ship, and only £1,100 on the freight, as he is a person who never insures much. * * * I do not suppose it is my duty to telegram the loss of said ship, do you? If so, I shall better know how to act in the future. Please inform me on this point. R. S. Gilchrist."

It was further admitted that the city of New York had been ever since and not before July 30, 1866, in telegraphic communication with Liverpool, England, and that the loss of the Sunda could have been communicated by Angell to the

plaintiffs on October thirtieth by telegraph, and that no such communication was made, and that the loss was not known to the defendant until after the issuing of the policy. The only other statement on the subject of the telegraph, admitted by the parties, was in the following words. "The telegraph between said places" (New York and Liverpool) " was, in October and November, 1866, used by merchants and others as a mode of communication whenever, in their judgment, the interest of their business required the necessary expense for that purpose."

A table was offered in evidence showing the statistics of telegraphic traffic. In the months of July, August and September 1866, under a £20 tariff, the average number of messages per day was twenty-nine. For the next twelve months under a £10 tariff, the daily number was sixty-four. As the tariff diminished, the number increased. In some of the months of 1870, under a tariff of thirty shillings, the average number was nearly 500 per day.

The defendant's counsel moved to dismiss the complaint. The motion was denied and the defendant excepted.

The court thereupon directed the jury to find a verdict for the plaintiff. This direction was excepted to by the defendant.

*Townsend Scudder* for the appellant. Plaintiff did not use due and reasonable diligence to communicate the loss to defendant; he should have telegraphed. (*Fitzherbert* v. *Malther*, 1 T. R., 12; *Gladstone* v. *King*, 1 M. & S., 35; *Stewart* v. *Dunlop*, 4 Bro. P. C., 483; 1 Pars. on Mar. Ins., 453, *note* 4; *G. Ins. Co.* v. *Ruggles*, 12 Wheat., 408; 2 Duer on Ins., 415; 1 Phil. on Ins., § 549; 1 Pars. on Mar. Ins., 458; 2 id., 162; *Proudfoot* v. *Montefiore*, E. L. R., 22 B., 511; *Watson* v. *Delafield*, 2 J. R., 526; *Andrews* v. *Mars. Ins. Co.*, 9 id., 34.) The insured is bound to use the same diligence to prevent the insurance as he would to prevent the payment of the premium if the vessel were safe. (2 Duer on Ins., §§ 13, 19, 410, 534, *note* 4.)

*Richard H. Huntley* for the respondents.   The only-duty of the insured was to communicate the loss with reasonable diligence and by the usual means.   (*Green* v. *Mer. Ins. Co.*, 10 Pick., 402; *McLanahan* v. *Univers. Ins. Co.*, 1 Pet., 170, 185; 1 Phil. on Ins., 309, § 561; 1 Pars. on Ins., 438; *Proudfoot* v. *Montefiore*, 2 E. L. R. [Q. B.], 511; *Clement* v. *Phœ. Ins. Co.*, 6 Blatch., 484.)   Defendant was bound to prove affirmatively that plaintiffs were guilty of conceal ment.   (*Folsom* v. *Mer. Mut. Ins. Co.*, 8 Blatch., 170, 176; *Fiske* v. *N. E. Mar. Ins. Co.*, 15 Pick., 310; 2 Pars. Mar. Ins., 533.)   The policy, which was executed November 9, 1866, was made to cover a period of time at and from October 27, 1866, at noon, for one year, and is valid and binding.   (*Folsom* v. *Mer. Mut. Ins. Co.*, 8 Blatch., 170, 173; 1 Phil. on Ins., § 925; 1 Arn. on Ins., § 20.)

DWIGHT, C.   The general rule of law is well settled, that if intelligence of a fact enhancing the risk or of a loss is received after an order has been given for a marine insurance and before the contract is executed, it must be communicated to the underwriters with due diligence, or the order be countermanded.   (1 Phillips on Ins., § 561.)

The question open to controversy in the above proposition is, the meaning of the expression "due diligence," or "due and reasonable diligence," as found in some of the authorities. It is claimed by the defendant that it means *extreme diligence.* To support this view a *dictum* in *Andrews* v. *Marine Ins. Co.* (9 J. R., 34), is referred to; also, 2 Duer on Insurance (note 4, p. 530).

In order to determine this question a general view should be taken of the authorities.

The defendant urges that the rules of morality require that the insured should use the same diligence to prevent the insurance as he would to prevent the payment of the premium if the vessel were safe, citing 2 Duer on Insurance (§§ 13 and 19, p. 410).

This consideration would address itself to us with much

force if the question were new and open to be considered on purely theoretical grounds. The law on this subject seems to be easily ascertained from the decisions, and it is incumbent upon us to apply and enforce it as we find it.

One of the earliest cases on this subject is *Grieve* v. *Young*, in the Scotch Court of Sessions, reported in Millar on Insurance. On December 10, 1779, Grieve, a merchant in Eyemouth, wrote to his correspondent in Edinburgh to take out an insurance on his ship, which had just sailed, and was then out of danger. As Eyemouth was not a post town, Grieve sent the letter to a place on the London post road, whence it would be sent by post to Edinburgh. It was sent on the evening of the tenth, and arrived at six o'clock P. M. on the eleventh. The insurance was taken at eight o'clock. The ship was in danger on the evening of the tenth, and went to the bottom at ten o'clock of the morning of the eleventh. Grieve was aware of all the facts of the case. The court held that it was not incumbent upon him to send by express to Edinburgh to give information of the facts, but only to make use of the mail and post a letter at once, countermanding the order.

This case was approved in *Watson* v. *Delafield* (2 Caines, 224; S. C., 1 J. R., 150); and in the Court of Errors (2 id., 526). It was held in this case that if an insured, having written letters ordering an insurance, learns of a loss he is bound, if practicable, to countermand his order by the same mail.

The Supreme Court of the United States, through Mr. Justice STORY, lays down the correct rule upon this subject in the case of *McLanahan* v. *The Universal Insurance Company* (1 Peters, 170), as follows: Where a party orders insurance and afterward receives intelligence material to the risk, or has knowledge of a loss, he ought to communicate it to the agent by "due and reasonable diligence," to be judged under all the circumstances of each particular case, for the purpose of countermanding the order or laying the circumstances before the underwriters. The "extreme diligence" recognized in

*Andrew* v. *Marine Insurance Company* may be reconciled with the views of Justice Story by assuming that, in special cases, extreme care may be requisite to constitute due and reasonable diligence.

The case of *Green* v. *Merchants' Ins. Co.* (10 Pick., 402), presents this question in a clear light. The proposition is there laid down that if a person who has directed insurance to be procured at a distant place, on a risk already commenced, receives, before the contract is made, intelligence of a loss, he is bound to transmit the intelligence by the earliest and most expeditious *usual* route of mercantile communication, in order that it may be laid before the person requested to underwrite; but the omission to send by an unusual and extraordinary conveyance, although by possibility it might arrive before the policy was effected, will not vitiate the policy. The question whether a particular mode of communication is a usual one, is matter of fact, and must, in general, be found by a jury. (*Green* v. *Merchants' Ins. Co.*, 10 Pick., 402; *McLanahan* v. *Universal Ins. Co.*, 1 Peters, 186; *Byrnes* v. *Alexander*, 1 Brevard [S. C.], 213.)

Following these authorities we must hold that the plaintiff was not bound to resort to the telegraph to communicate the loss of the Sunda to the defendant, unless that was at the time a usual means of mercantile communication.

The statement of facts on which the court below acted contains no finding upon this subject. In fact, it seems studiously to avoid any such finding. Had there been a distinct proposition submitted that the telegraph was then a " usual mode of mercantile communication," the plaintiff must clearly have failed to establish a case for recovery. Instead of that the statement is, that the telegraph between said places (Liverpool and New York) was used by merchants and others as a mode of communication whenever, in their judgment, the interests of their business required the necessary expense for that purpose. This is, by no means, equivalent to a statement that it is a " usual" mode of mercantile communication. Nor do the statistics of the traffic help the case. At the time

of the disaster the rates were very high between New York and Liverpool, and the telegraph messages were infrequent. All the messages between Valentia and Heart's Content, or in other words, between America and Europe, averaged but twenty-nine per day both ways, or fifteen from Europe to America. This was the entire telegraphic correspondence between the two countries for all forms of business, and for all the requirements of friendship and affection. This average had prevailed for three months. The messages for the last of the three months averaged ten less than for the first. Under this state of facts I can see no reason for finding that the telegraph was at that time a usual means of mercantile communication, within the meaning of the authorities that have been cited.

The case of *Proudfoot* v. *Montefiore* (L. R. [2 Q. B.], 513), is not opposed to this view. In that case the appellate court, by agreement of counsel, was authorized " to draw inferences of fact as they thought proper." It was held, accordingly, that as the entire telegraph between the places referred to in that case was in " general use" between agents and their employers, it was the duty of the insured to make use of it. That decision is in entire conformity with the principles followed in the case at bar, as it turns upon the special circumstances presented to the court. It would be followed in this cause if we could be satisfied (as the English court was on the facts submitted to it) that the telegraph between Liverpool and New York was, on October 31, 1866, a usual means of mercantile communication.

The judgment of the court below should be affirmed.

Reynolds, C. (dissenting). The judgment of the Supreme Court in this case ought not to be sustained. It does not appear to be founded upon any principle of fair dealing which the law should approve. When the policy upon the ship was written insuring it against the perils of the sea it was a total wreck at the bottom of the ocean, near the coast of England, and this was known to the owner, for whose benefit

the action is brought, but not communicated to the under-writer. The subject of the insurance, therefore, at the time of making the policy, was not in existence. The ship insured was named the Sunda, owned by William Fry Angell, and on the 25th day of October, 1866, was lying in the port of Liverpool receiving a cargo of coal preparatory for a voyage to Aden, and probably from thence to Bombay, to load cotton for England. On that day, desiring to effect an insurance on the vessel in the city of New York, he directed his broker in Liverpool to write to the plaintiffs in New York by the first mail, to effect an insurance on the vessel. In pursuance of these instructions, on the twenty-seventh day of October a letter was written to the plaintiffs and forwarded by the mail steamer of that day, and reached New York on the eighth day of November following, and on the ninth the policy was issued on account of whom it may concern, from the twenty-seventh day of October, at noon, for one year, for the sum of $5,000, and in consideration a premium note for $750 was given by the plaintiffs. On the twenty-ninth day of October the Sunda sailed from the port of Liverpool on her voyage to Aden, and on that night, while proceeding to sea, was wrecked and lost on the coast of England, by a peril insured against, and this fact was known to the owner, Angell, on the following day, the 30th of October 1866. On the thirty-first the broker of Angell at Liverpool wrote to the plaintiffs informing them of the disaster to the ship, and sent it by the first mail to the United States, and the plaintiffs received it on the fifteenth of November after the policy had been written. It sufficiently appeared that information of the loss of the Sunda could, at greater or less expense, have been communicated to the plaintiffs in New York by cable telegraph, then in full operation, many days before the policy in question was issued; but this was not done. In the letter last referred to the broker of Angell says: "Probably you may hear of this by telegram before you receive my letter, but if you do not, and have the insurance effected, I suppose it will be all right, as the owner, Mr. Angell, has nothing more on

the ship  *  *  *  and is a person who never insures much.
*  *  *  I do not suppose it my duty to telegram the
loss of said ship; do you? And if so I shall better know
how to act in future.  Please inform me on this point?"
The case does not show whether the desired information
was or was not given, but, we may assume that it was not
thought to be necessary to send a cable telegram of the loss
of the ship, and this view was concurred in by the Supreme
Court.

In a contract for marine insurance, the rule is specially
stringent that every fact within the knowledge of the assured
affecting the risk must be communicated to the underwriters.
(3 Kent Com., 282.)  It is to be regarded as settled law that
if an order for insurance is given and the insurance effected
before either party knew that a loss had happened the policy
will be valid.  But if, after an order given to insure a ship
against the perils of the seas, and before the insurance is in
fact effected, a loss happens to the knowledge of the appli-
cant, he is bound to use the utmost degree of reasonable dili-
gence to communicate the fact or countermand the instruc-
tions.  This is not only sound law but good morals.  (1
Arnold on Ins. [2d Am. ed.], 642; id. [3d Eng. ed.], 537;
*Green* v. *Merchants' Ins. Co.*, 10 Pick., 402.)  It must be
admitted that even under such a condition of things the
applicant is not bound to resort to any unusual or extraor-
dinary means to communicate the fact or countermand the
instruction.  It is not necessary in this case to undertake to
consider the cases where a distinction is sought to be made
between the knowledge of a principal and agent where one
or the other knew or was ignorant of a fact material to the risk
not communicated to the underwriters.  In this case both
the owner and his agent at Liverpool knew the fact of the
loss of the ship in season to have advised the plaintiffs before
the insurance was applied for.  There can be but two reasons
why the cable telegraph was not resorted to, and one is that
it was more or less expensive and not resorted to except for
special reasons, and the other is that the owner of the vessel

was willing to take a policy of insurance that he could enforce against the underwriters, when he knew the subject of insurance, was lying a total wreck in the very bottom of the ocean, when the perils of the voyage to be insured against had scarcely commenced. In such a case I think the utmost degree of reasonable diligence should require a party to employ any improved means of speedy communication across the ocean. When vessels under sail alone traversed the waters of the Atlantic between Liverpool and New York, a communication sent by that means of conveyance, if the first opportunity was employed, would have been regarded as reasonable diligence ; when steamships were introduced which made the voyage in greatly less time, the employing of a sailing vessel to carry an important message, in which time was to the last degree material, could not have been approved. So when speedier means of communication by cable was in full and successful operation, it was not reasonable diligence to employ the mail carried by steamship, when the owner and his agent at Liverpool knew that the message could not be received, at least in season, to prevent an application for insurance in New York against the perils of a voyage to the east, of a vessel then lying a total wreck, near the harbor of Liverpool, on the coast of England. It is urged that the cable was not at the time in general use ; but I think the evidence shows that it was, and it is undisputed. It was mainly the production of commercial men, as a means of communicating speedy information between distant countries whose commercial relations were intimate and important ; and at the time of the loss of the Sunda it was extensively used for that purpose. It was, doubtless, expensive to a considerable degree, and we are asked to decide, as a matter of law, that the owner of the vessel was not obliged, in the effort to act with reasonable diligence, to resort to it. We are unable to fix the money tariff of commercial integrity, whether the amount is to be measured by the value of greenbacks or gold, but I think it is at least

worth as much as any contract procured by deliberate conceal-
ment, indirection or fraud. (*Watson* v. *Delafield*, 2 J. R., 526;
*Andrews* v. *Marine Ins. Co.*, 9 id., 34; 1 Arnould on Ins.
[Am. ed.], 26; *Proudfoot* v. *Montefiore*, 2 Eng. Law R. [Q.
B.], 511.)   We think the law required that the owner of the
vessel, after he knew of the loss, should have countermanded
the order to insure by the very best means at command, to
make it effectual.   It was known that this could be done by
cable; and whether a message should thus be sent was,
obviously, a matter of consideration at Liverpool; but there
is nothing to indicate that it was not sent on account of the
cost.   Angell did not insure much, and had none on the ship
except such as was made by the defendant in New York.
The broker of Angell at Liverpool, as shown by his letters of
the thirty-first of October, obviously struggled between his
duty to telegraph and the desire to have a policy which could
be enforced for the benefit of his employer, who he most
probably, in such an emergency, consulted.   He doubted if he
was bound to telegraph; and if the insurance was effected
before the news of the loss of the ship had reached New York
he had a somewhat shadowy notion that it would be "all
right."   But I am compelled to come to a different con-
clusion.   If the hazard of incurring the expense of the cable
telegram was the reason why the fact of the loss of the ves-
sel was not sent through that speedy channel, it may be sug-
gested that there was no special obligation on the part of
Angell to attempt to enforce the policy thus obtained for his
benefit.   If motives of economy deterred him from commu-
nicating a fact in the last degree material to the risk which
the defendant, in pursuance of the true state of the case, had
undertaken to assume, it was very easy to direct his broker,
by the next mail steamer for New York from Liverpool,
instead of a suggestion that if the policy was obtained
before the fact was known, it would be "all right," to
say, that if one had been obtained it must be at once
surrendered.

   I think the policy is void, for reasons before stated; that

the plaintiffs are not entitled to recover, and that the judgment below must be reversed and a new trial granted, with costs to abide the event.

For affirmance, LOTT, Ch. C., EARL and DWIGHT, CC.

For reversal, REYNOLDS and GRAY, CC.

Judgment affirmed.