## SPRINGFIELD FIRE & MARINE INS. CO. v. NATIONAL FIRE INS. CO. et al.
### No. 9008.

Circuit Court of Appeals, Eighth Circuit.
July 20, 1931.

Stuart S. Ball, of Des Moines, Iowa (J. L. Parrish, Thomas J. Guthrie, and Thomas Watters, Jr., all of Des Moines, Iowa, on the brief), for appellant.

Robert J. Bannister, of Des Moines, Iowa (H. H. Stipp, D. D. Holdoegel, and Stipp, Perry, Bannister & Starzinger, all of Des Moines, Iowa, on the brief), for appellees.

Before KENYON and BOOTH, Circuit Judges, and OTIS, District Judge.

BOOTH, Circuit Judge.

This is an appeal by the Springfield Fire & Marine Insurance Company (hereafter called defendant company) from a judgment on a fire insurance policy issued by it.

The action was brought against appellant by five other fire insurance companies (hereafter called plaintiff companies) as assignees of the rights of the Grimes Canning Corporation, the insured under the policy.

The case was originally brought in the state district court of Polk county, Iowa, but was duly removed to the United States District Court.

The following facts were admitted in the pleadings or were stipulated: The Grimes Canning Corporation owned and operated a canning factory at Rockwell City, Iowa. Prior to September 7, 1929, it had taken out insurance with the five plaintiff companies on its manufactured merchandise contained in its two-story warehouse at its factory plant to the amount of $100,000. On September 4, 1929, it contracted with the defendant company for an additional policy of insurance on said merchandise in the amount of $30,000. The policy was issued, but was to take effect at noon on September 7, 1929, Central Standard Time. A fire occurred on the 7th of September, 1929, which destroyed or damaged the insured stock. The total value of the insured stock at the time of the fire was $99,916.52.

A dispute arising as to the liability of defendant company under the policy issued by it, the plaintiff companies paid the Grimes Canning Company $99,916.52, as payment of the loss and purchase price for the damaged property, and in consideration of the assignment to the plaintiff companies of whatever rights the Grimes Canning Company had to recover on its policy issued by the defendant company. This settlement was effected by the payment of specific amounts by each of the plaintiff companies, and the execution of separate instruments of assignment. The plaintiff companies took over the salvage remaining from the stock of goods damaged in said fire, and realized thereon the sum of $29,926.98.

If the defendant is liable in this action, the extent of its liability is the sum of $16,151.43 with interest.

The defendant company had prompt notice of the loss after the occurrence thereof.

issued by the defendant company was in force at the time of the loss.

The record discloses substantial evidence tending to establish the following facts in addition to those already stated:

### Exhibit No. 1

Exhibit 1 is a plat showing the size and location of the buildings constituting the plant of the Grimes Canning Company at Rockwell City, Iowa, prior to the fire.

On the trial in the court below, at the close of all the evidence, plaintiffs and defendant moved for a directed verdict in their favor respectively.

The court directed a verdict for the plaintiffs.

The main issue in the trial court and upon this appeal is whether the policy of insurance

### The Buildings.

The principal buildings of the Grimes Company's plant were the husking shed, the cooker house, and the factory. The latter building contained the warehouse, the boiler room, and the canning factory or process room.

The buildings are shown on the plat introduced in evidence as Exhibit 1.

The factory was of brick and frame construction, two stories high, except a small part at the north end which was three stories.

The boiler room was separated from the canning factory on the north and from the warehouse on the s^uth by brick walls about sixteen inches thick extending two feet or more above the roof. Through the north brick wall and on the first floor, there was a door leading from the boiler room to the canning factory or process room; through the south brick wall and on the second floor, there was a door leading from the second story of the boiler room to the warehouse, and there was a smaller opening about eighteen inches square for a can track. There was also a fire door through the south brick wall leading from the cooker house to the warehouse. The boiler room contained three boilers equipped with oil burners underneath the boilers on the west end. The floor of the boiler room was of cement and was about six feet below the first floor of the canning factory adjacent on the north. There was a door in the west side of the boiler room. The roof of the boiler room and of the warehouse was of composition. Above the boiler room was a second story room used for tools, etc. The warehouse to the south of the boiler room was about 125 feet long by 65 feet broad, two stories in height. The floors were of wood. There was no door on the first floor through the brick wall between the warehouse and the boiler room. There was an elevator and a small "case" elevator leading from the first to the second floor near the north wall of the warehouse. The insured merchandise was in the warehouse at the time of the fire. It consisted of canned corn and the cans were piled commencing at the south end of the warehouse and running to within 25 or 30 feet of the north end of the warehouse, on the east side of the first floor; and to within about 50 feet of the north end, on the west side of the first floor. On the second floor, cans were piled to within about 60 feet of the north end of the warehouse.

### The Fire.

A few minutes before 12 o'clock noon on September 7, 1929, a fire was discovered in the boiler room. Apparently oil had escaped from the oil burners and accumulated on the floor and had caught fire. The public fire alarm whistle was blown at two minutes before 12 o'clock. The fire chief reached the scene about four minutes thereafter. At that time, and for several minutes later, the fire had not worked out of the boiler room. The chemical and fire trucks arrived within five to seven minutes after the alarm. Gradually the fire worked from the boiler room into the canning factory to the north; thence up to the second story of the same. It then worked back to the south and entered the warehouse either through the roof or through one of the openings in the wall which was at the north end of the warehouse. It was from twenty to thirty minutes after the fire started before it reached the warehouse. Firemen had been in the warehouse playing the hose from there in an endeavor to check the fire.

The appellant makes two contentions: First, that prior to the date when the policy issued by the defendant company was to take effect, it had become certain that the property to be insured would be destroyed or damaged by the fire which had already started, and this situation existing, the policy of the defendant company never took effect; second, that the hazard had been very materially increased between the time when the policy was issued and the time when it was to take effect, and this situation existing, the policy of defendant company never took effect.

Obviously, the first of these contentions involves a question of fact and a question of law.

Whether, prior to the date when the policy was to take effect, it had become certain that the property to be insured would be destroyed or damaged by the fire which had already started, is clearly a question of fact. This question of fact was by the motion of defendant company withdrawn from the jury and left to the court for determination. It is a familiar doctrine that when both parties move for a directed verdict, the granting of the motion of one party carries with it a determination of all questions of fact necessary to support the verdict and judgment in favor of that party. Phenix Ins. Co. v. Kerr, 129 F. 723, 66 L. R. A. 569 (C. C. A. 8); Clapper v. Gamble, 28 F.(2d) 755, 758 (C. C. A. 8), and cases cited; Hookway v. First Nat. Bank, 36 F.(2d) 166 (C. C. A. 8); Odegard v. Gen. Cas. & Sur. Co., 44 F.(2d) 31, 40 (C. C. A. 8), and cases cited; Sena v. American, etc., Co., 220 U. S. 497, 31 S. Ct. 488, 55 L. Ed. 559; Reynolds v. Zarlengo, 22 F.(2d) 626 (C. C. A. 8). The only questions left open for the appellate court under such circumstances are whether there was any substantial evidence in favor of such necessary findings, and whether there was error in the application of the law. See cases cited supra.

A consideration of the evidence has convinced that it was not certain at 12 o'clock noon September 7, 1929, that the property insured would be destroyed or even damaged by the fire. It was uncertain whether the efforts of the firemen would not succeed in put-

ting out the fire and in saving the contents of the warehouse. It was not certain that closing the door and the opening in the fire wall between the warehouse and the boiler room might not prevent damage to the insured merchandise. It was not certain that the fire might not be put out by a thunder shower. The fire lasted for several days. It was not certain that the insured merchandise might not be removed in whole or in part to a place of safety. Further, the evidence shows that the insured merchandise was not entirely destroyed. There was about $30,000 salvage obtained. The aleatory element was never absent.

The decision by the trial court of this question of fact involved in the first contention of defendant company was, in our opinion, supported by substantial evidence. It becomes unnecessary, therefore, for us to determine the question of law involved in defendant company's first contention.

The second contention above mentioned also involves a question of fact and a question of law.

The question of fact is whether the existence of the fire in the boiler room prior to 12 o'clock noon on September 7, 1929, materially increased the fire hazard of the merchandise stored in the warehouse at the time.

The question of law is whether such increased hazard, if it existed, prevented the policy of insurance of defendant company from taking effect.

The question of fact here involved must, we think, have been determined in favor of defendant company. It is conceded by appellees, and we think rightly so, that the existence of the fire in the boiler room prior to 12 o'clock noon on September 7, 1929, did materially increase the danger of loss or damage by fire to the merchandise stored in the warehouse.

The question of law remains: Did this increased danger prevent the policy of insurance issued by defendant company from taking effect at the time agreed upon, viz., at 12 o'clock noon September 7, 1929?

No case has been cited by counsel which is directly in point, and we have found none. Resort must therefore be had to established principles of insurance law and to cases having more or less bearing upon the case at bar. It is fundamental in the law of contracts of insurance that the policy is the sole source of the obligation of the parties. Union Mutual Life Ins. Co. v. Mowry, 96 U. S. 544, 24 L. Ed. 674; El Dia Ins. Co. v. Sinclair (C. C.

A.) 228 F. 833. This does not necessarily mean that the words of the policy expressly state all of the conditions accompanying and forming a part of the contract between the parties. Courts have in very many instances held that certain implied conditions enter into and become part of the contract as surely as if they were stated in the wording of the contract. Statutory provisions are a familiar example.

Also, in life insurance contracts, the existence of the person whose life is the subject-matter of the contract at the time the contract is to take effect is an implied condition to the validity of the contract. 37 C. J. 385, § 49; Rhodus v. K. C. Life Ins. Co., 156 Mo. App. 281, 137 S. W. 907; Dickey v. Cont. Cas. Co., 40 Tex. Civ. App. 199, 89 S. W. 436, 438; see Riegel v. Amer. Life Ins. Co., 140 Pa. 193, 21 A. 392, 11 L. R. A. 857, 23 Am. St. Rep. 225; Id., 153 Pa. 134, 25 A. 1070, 19 L. R. A. 166.

In marine insurance contracts, where the policy of insurance was on a vessel "at and from" a certain port, it was held in an early case that there was an implied condition that the vessel should be at the port specified "in good safety" before the policy would attach. Parmeter v. Cousins, 2 Campbell, 235. It was also held where the policy was on a vessel "at and from" a certain port that there was an implied condition that the vessel should be at the port specified within such time that the risk should not be materially varied. De Wolf v. Archangel, etc., Ins. Co., Ltd. (1874), L. R. 9 Q. B. 451. These implied conditions have been deduced by the courts from the wording of the contract or from the nature of the contract or from the circumstances surrounding the contract. Thus in Parmeter v. Cousins and in De Wolf v. Archangel, etc., Ins. Co., the real inquiry was as to the point of time at which the policy attached, and in order to determine this question, the various matters above mentioned were given consideration. But where the words of the policy are definite and certain, they govern.

Thus in marine insurance, where the policy is to take effect on a certain date and covers a vessel "lost or not lost," the policy takes effect on the day named, even though the vessel was lost at the time the policy was made. 38 C. J. 1016, 1038, §§ 31, 93. See also Barker v. Janson (1868) L. R. 3 C. P. 303; Mercantile Ins. Co. v. Folsom, 18 Wall. 237, 251, 21 L. Ed. 827.

And in fire insurance, where a policy is executed on a given date but is antedated as to the commencement of the risk, the policy

is valid and effective even though the property covered was destroyed by fire prior to the actual making of the policy, but within the period of the antedated risk. El Dia Ins. Co. v. Sinclair, supra; Hallock v. Commercial Ins. Co., 26 N. J. Law, 268; Id., 27 N. J. Law, 645, 72 Am. Dec. 379; Security Fire Ins. Co. v. Ky. Ins. Co., 7 Bush (Ky.) 81, 3 Am. Rep. 301.

However, in the case of marine insurance policies "lost or not lost," and in the case of fire insurance policies where the period of risk antedates the making of the contract, there is the implied condition that the party insured does not know at the time of procuring the policy that the property insured has already been destroyed. Mercantile Mut. Ins. Co. v. Folsom, supra; El Dia Ins. Co. v. Sinclair, supra; Security Fire Ins. Co. v. Ky. Ins. Co., supra; see Wales v. N. Y., etc., Ins. Co., 37 Minn. 106, 109, 33 N. W. 322.

And this brings us to a second cardinal rule of insurance contracts: That they are contracts uberrimae fidei. This rule, early adopted as to marine insurance contracts, has later been adopted as to life insurance contracts. Stipcich v. Ins. Co., 277 U. S. 311, 316, 48 S. Ct. 512, 72 L. Ed. 895. As applied to fire insurance, see Blumer v. Phoenix Ins. Co., 45 Wis. 622; Columbian Ins. Co. v. Lawrence, 2 Pet. 25, 49, 7 L. Ed. 335; Id., 10 Pet. 507, 515, 9 L. Ed. 512.

It may be open to question whether in the United States the same rule has been adopted to its full extent as to fire insurance contracts. There would seem to be certain obvious distinctions between fire insurance contracts on the one hand and marine insurance contracts on the other. In the case of fire insurance, the subject-matter of the insurance is usually open to full inspection by both parties. In marine and life insurance, the insurance company is obliged to rely to a very considerable extent on the information obtained from the insured. See Hartford Ins. Co. v. Harmer, 2 Ohio St. 452, 59 Am. Dec. 684; 32 C. J. 1271, § 487; Hanover Fire Ins. Co. v. Merchants' Transp. Co. (C. C. A.) 15 F.(2d) 946, 948; Penn Mut. Life Ins. Co. v. Mechanics' Sav. Bank & Tr. Co. (C. C. A.) 72 F. 413, 433, 38 L. R. A. 33; II Cooley Briefs on Insurance, p. 1204; General Reins. Corp. v. So. Surety Co., 27 F.(2d) 265, 273 (C. C. A. 8).

But it is not of vital importance in the case at bar whether or not the rule of uberrimae fidei applies in its full extent to fire insurance contracts. We may treat the case at bar as if such rule did apply. Under that rule, it is well settled that an applicant for insurance must use due and reasonable diligence to disclose to the insurance company all facts affecting the risk which arise after his application has been made, and before the contract has been consummated. Thus, in M'Lanahan v. Universal Ins. Co., 1 Pet. 170, page 185, 7 L. Ed. 98, which was an action on a policy of marine insurance, the court, in discussing the principle under consideration, used the following language: " * * * Where a party orders insurance, and afterwards receives intelligence material to the risk, or has knowledge of a loss; he ought to communicate it to the agent, as soon as, with due and reasonable diligence, it can be communicated, for the purpose of countermanding the order, or laying the circumstances before the underwriter. If he omits so to do, and by due and reasonable diligence the information might have been communicated, so as to have countermanded the insurance, the policy is void." See also Piedmont, etc., Ins. Co. v. Ewing, 92 U. S. 377, 23 L. Ed. 610; Equitable Life Assur. Soc. v. McElroy, 83 F. 631, 636 (C. C. A. 8); Cable v. United States Life Ins. Co. (C. C. A.) 111 F. 19, 26, reversed on other grounds 191 U. S. 288, 24 S. Ct. 74, 48 L. Ed. 188; Graham v. General Mut. Ins. Co., 6 La. Ann. 432.

In Equitable Life Assur. Soc. v. McElroy, supra, the court said (page 636 of 83 F.): "The honesty, good faith, and truthfulness of the person whose life is insured form the actual foundation of the agreement of life insurance. It is for this reason that contracts of life insurance are said to be uberrimae fidei, and any material misrepresentation or concealment is fatal to them. When the representation of good health and the certificate of the surgeon have been made, and the contract is not immediately closed, but negotiations for it continue, and proposals and counter proposals are made, but for some time none are accepted, the representation and certificate continue and condition all the proposals and the ultimate contract, when it is closed."

But the rule thus established does not require the insured to use extraordinary diligence or to employ extraordinary means to inform the insurance company of any changes in the risk which have taken place during the negotiations and before the policy has attached.

It was held in Neptune Ins. Co. v. Robinson, 11 Gill & J. (Md.) 256, that an applicant for insurance was not required to use all possible means of acquiring information ma-

terial to the risk, up to the last instant of time; and that, therefore, his failure to call at the postoffice where a letter was received on the morning of the day that he effected insurance upon a vessel, in which letter the captain of the vessel informed him that she had been lost, did not vitiate the policy.

See also Green v. Merchants' Ins. Co., 10 Pick. (Mass.) 402; Snow v. Mercantile Mut. Ins. Co., 61 N. Y. 160; 8 L. R. A. (N. S.) 983 note.

■ Turning to the case at bar, the facts are that the policy of fire insurance did not in express terms or by any fair construction of the words used provide that a material increase in the risk between September 4th and September 7th would prevent the policy from attaching. There was nothing in the nature of the contract or in the surrounding circumstances which required such a provision. There was no applicable statute which so provided. The policy by its express terms was to be effective from a definitely stated moment of time. The property insured was in existence and undamaged at the time when the policy was to take effect. There is no evidence tending to show either lack of the highest good faith or want of due diligence on the part of the insured at any time.

Considering these facts in the light of the principles heretofore discussed, we cannot say that the increase of hazard, material though it was, prevented the policy from attaching. If it were true that a material increase of hazard between the commencement of negotiations for insurance and the taking effect of the policy ipso facto prevented the policy from attaching, there would be no reason for the rule of due diligence and good faith on the part of the insured in making known such increase of risk to the insurance company.

■ Appellant, by its contention, in effect asks that the contract between it and the insured be modified by adding a new condition. We have no authority to make such a change, and we have found no case in which such action has been taken by a court, although opportunity has not been wanting. See Saul v. N. W. Nat. Ins. Co., 79 Pa. Super. Ct. 322; Day v. Hawkeye Ins. Co., 72 Iowa, 597, 34 N. W. 435. If such a condition were deemed advisable, it would have been an easy matter for the insurance company to insert it along with the numerous other conditions contained in the policy. We are not called upon to determine whether the insertion of such a condition in the policy would increase or decrease uncertainty and litigation. That ques-

tion is a serious one with which we are not here concerned. What we do determine is that no such condition was a part of the contract in the case at bar.

The judgment is affirmed.