EQUITABLE LIFE ASSUR. SOC. v. McELROY et al.

(Circuit Court of Appeals, Eighth Circuit.   August 2, 1897.)

No. 787.

1. LIFE INSURANCE—REPRESENTATIONS—CONCEALMENT.
  The intentional omission, by an applicant for life insurance, to disclose to the company every fact material to the risk (especially the fact of a sudden and dangerous illness) which comes to his knowledge at any time before the contract is finally closed, even though subsequent to his original representations and medical examination, is a fraud which vitiates the contract.

2. SAME—ORAL CONTRACT OF INSURANCE—PRESUMPTIONS.
  In view of the custom of life insurance companies to contract by written policies, there is a strong presumption, where no policy has been issued and no premium paid, that there was no contract, and no intention to contract, otherwise than by a policy made and delivered upon the simultaneous payment of a premium.   Caldwell, Circuit Judge, dissents.

3. SAME—PREPAYMENT OF PREMIUMS—WAIVER.
  Unless a life insurance company does or omits some act whereby the assured has just ground to believe, does believe, and acts on the belief, that the corporation will make, continue, or restore a contract without the payment of a premium, there is no estoppel and no waiver.

4. SAME—LAPSE OF POLICY—REVIVAL—NEW CONTRACT.
  Where a life insurance policy has lapsed and become void, it cannot be revived without a new contract between the parties.

5. TRIAL—DIRECTING VERDICT.
  It is the duty of the trial court to direct a verdict in favor of the party who is clearly entitled to it, where the evidence is such that a verdict for his opponent must be set aside by the court.

6. LIFE INSURANCE—CHANGE OF PARTIES.
  The parties to a contract of life insurance are as important as the subject-matter, and parties cannot be imported or substituted upon one side without the consent of those on the other.

7. SAME—TENDER OF POLICY—CONDITIONAL ACCEPTANCE.
  Where a life insurance policy is tendered, an acceptance on condition that the beneficiaries be changed does not, until approved by the company, close the contract, even though the assured could have accepted it as it stood, and then assigned it to the proposed beneficiaries.

8. TRIAL—INSTRUCTIONS—ASSUMED STATE OF FACTS.
  It is error to charge the jury upon an assumed state of facts, to which no evidence applies.

9. CONTRACTS—PROPOSAL AND ACCEPTANCE.
  Mere delay in accepting or rejecting a proposal does not make a contract.

10. SAME.
  The acceptance of an offer, if not communicated to the proposer, does not make a contract.

In Error to the Circuit Court of the United States for the Western District of Missouri.

L. C. Krauthoff (J. V. C. Karnes and Daniel B. Holmes on brief), for plaintiff in error.

Gardiner Lathrop (H. M. Beardsley on brief), for defendants in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge.    This was an action upon a policy of insurance upon the life of James E. McElroy, issued by the Equitable Life Assurance Society of the United States, the plaintiff in error, on June 29, 1894, to Della Irene McElroy, James Edward McElroy, and Myrtle Beckham McElroy, the defendants in error.    The insurance company answered to the complaint of the defendants in error upon that policy that on June 29, 1894, negotiations were pending between McElroy and the company relative to the insurance of his life, but no contract had been made, and no premium had been paid; that on June 26, 1894, he was taken seriously ill with appendicitis; that on June 28, 1894, expert physicians and surgeons decided that a dangerous surgical operation offered the only chance of saving his life; that he was taken to a hospital, and such an operation was performed upon him on that day; that on June 29, 1894, Helen C. Doty, the private secretary of McElroy, who knew these facts, of which the company was ignorant, appeared in its office in New York, concealed the whereabouts of McElroy, his illness, and the operation that had been performed upon him, represented that he was in good health, but was absent in Boston, and had left funds with her to pay the premium for, and to consummate the contract of, insurance, paid a part of the premium on that day and the remainder on the next day, and thereby induced the company to issue the policy in suit, which it would not have done if it had been informed of the facts. McElroy died about 4 o'clock on the morning of June 30, 1894, from the effects of the disease and the operation.    The case was tried to a jury, and there were a verdict and judgment against the company for the full amount of the policy.    The writ of error challenges this judgment, and the alleged errors on which counsel place their chief reliance are the refusal of the court to instruct the jury to return a verdict in favor of the assurance society, and some portions of its charge relative to the legal effect of the facts established by the proof.    A statement of these facts is essential to an understanding of the questions presented by the assignment of these errors.

The facts which stood admitted or established by uncontradicted testimony or by the evidence introduced by the defendants in error at the close of the trial were these:    On December 30, 1892, the assurance society issued its policy No. 627,641 on the life of McElroy, for $100,000, payable to James E. McElroy, his executors, administrators, or assigns, in 30 equal annual installments after his death, in consideration of the annual payment, in advance of a premium of $1,669 on or before the 30th day of December in every year during the continuance of the contract.    This policy was a tontine installment policy, and provided that at the end of the tontine period, which was on December 30, 1912, the society would commute or discount and pay to McElroy, if living, any installment at the rate of $3\frac{1}{2}$ per cent. compound interest per annum, and would give him the option to receive the installments as they fell due, or in a single payment at the rate of discount stated.    The policy gave the same option to his executors, administrators, or assigns if he was dead when the first installment became due.    McElroy failed to pay the second premium on this policy, which fell due on December 30, 1893.

George E. Tarbell was third vice president of the society, and an intimate friend of McElroy. At the latter's request, he extended the time for the payment of this premium until January 30, 1894, but McElroy did not pay it, and the policy lapsed and was forfeited on that day. McElroy applied to Tarbell for a further extension, but was refused, because the rules of the society prohibited an extension of more than one month. During the spring of 1894, Tarbell repeatedly solicited McElroy to have his policy reinstated, and McElroy often urged Tarbell to become a director in a telephone corporation which he was promoting, but neither granted the request of the other. On May 8, 1894, Tarbell again urged McElroy to have his policy reinstated, and he replied that he did not know whether he should carry any insurance or not, but that, if he did, it would not be more than $50,000. Tarbell told him that he would be compelled to submit to another medical examination before his policy could be reinstated in any event, urged him to return his old policy and to take the examination, and assured him that taking the examination would put him under no obligation to take the insurance. On May 10th he was examined and certified by the surgeon of the society for restoration. On June 13th or 14th he brought his old policy to Tarbell, and said he had not decided how much insurance he would take. Tarbell told him that, if he would make up his mind and give him his check, he could put his insurance into effect. He declined to do so, and said he was not ready to determine that matter definitely, but that, if he took any insurance, he would probably take $50,000; and Tarbell told him he would have the policy reduced to $50,000, and take it down to him, and he replied that he would discuss the matter then. On June 14, 1894, the chief medical director of the society approved the report of McElroy's examination on May 10, 1894; and, by direction of Tarbell, a new policy on the life of McElroy, for $50,000, was written. This policy bore the same number, had the same tontine period, and was payable to the same parties, as the old policy; but it provided for the payment by the society of only $50,000, in installments one-half as large as those in the old policy, in "consideration of the payment in advance of $434, and of the semiannual payment of $434 * * * on or before the 30th day of June and December in every year during the continuance of this contract." Tarbell then wrote McElroy: "I have asked Miss Amendt to hand you policy No. 627,641, which, as per your request, we have reduced to $50,000, with the premium payable semiannually. Kindly give her your check for the same, $134, and she will have a renewal receipt sent to you;" gave this letter and the policy to his private secretary, Miss Amendt, and instructed her to hand the letter to McElroy, and, if he paid the premium, to deliver the policy to him. On June 15, 1894, she took them to him, delivered the letter, and told him what her instructions were. He read the letter, and said, "I don't want to do anything about that policy until I can see Mr. Tarbell." She urged him to pay the premium and take it. Then he read the policy, and said he wanted it made out differently; that he wanted $30,000 payable to his wife, and $10,000 to each of his children. Miss Amendt had no authority to change the policy in this way, and she

took memoranda of the names of the new parties, and told him she would take the policy back, and see if she could have it written as he desired, and that she would then bring it back, and deliver it to him, so that he could have the insurance. He replied, "No," never mind about that, that he wanted to see Tarbell. She took the policy and her memoranda back to the office, and placed them in her desk. Tarbell was then out of the city. When he returned, a few days later, she related the conversation she had with McElroy to him; but nothing further was done in the matter until after Miss Doty, McElroy's private secretary, appeared, on June 28, 1894, told them that McElroy was away, and had left funds with her to pay the premium, and asked for the policy. On June 26, 1894, McElroy was taken seriously sick with appendicitis. On the morning of June 28, 1894, the surgeons decided that his situation was grave, and that an operation offered the only chance for his recovery. He then called Miss Doty to his room, signed a number of blank checks, and told her to get the policy in suit, and pay the premium on it, but not to tell the officers of the society that he was sick. He was then taken to the hospital; the operation was performed; and he died from its effects, about 4 o'clock in the morning of June 30, 1894. Immediately after her interview with him, Miss Doty went to the office of the society, where she found Tarbell and Miss Amendt. She knew of the illness of McElroy, and that he had been taken to the hospital for the operation. She told them that McElroy was away, and had left instructions with her to pay the premium and get the policy, and asked if it was ready. Miss Amendt replied that it had not been touched, because she had not been feeling well, and she had let it go by. She said she was in a hurry for the policy, and asked if she could have it that day. She was told that it would be written as soon as possible, but that it would probably not be ready until the next day. Thereupon Tarbell directed the policy to be changed so that the beneficiaries should be Della Irene McElroy, Myrtle Beckham McElroy, and James Edward McElroy, Jr., instead of James E. McElroy, his executors, administrators, and assigns; and this was done. The next morning, June 29th, Miss Amendt telephoned to Miss Doty that the policy was ready, and Tarbell would bring it over to McElroy. She replied that McElroy was still away. Thereupon Miss Amendt took the policy to her, received McElroy's check for $434, told Miss Doty that there was $13.02 interest owing on this installment, and that another installment would be due the next day. She gave Miss Doty the receipt of the society for "$434, being the semiannual premium due on the 30th day of December, 1893, upon policy No. 627,641, on life of Jas. E. McElroy." On June 30, 1894, after McElroy's death, Miss Doty went to the office of the society, told Tarbell that McElroy was in Boston, that she did not know when he would return, but that he might go to Chicago before he came back, paid the $13.02 interest on the December installment, and the $434 which fell due on that day, and obtained the receipts of the society for "$13.02, interest on premium due Dec. 30, 1893," and for "$434.00, being the semiannual premium due the 30th day of June, 1894, upon policy No. 627,641, on the life of Jas. McEl-

roy." Miss Doty did not know that McElroy was dead when she had this interview. On July 2, 1894, two attorneys of the defendants in error visited the offices of the society, and interviewed Tarbell and Miss Amendt. They were permitted to testify, for the purpose of impeaching those witnesses, that Tarbell said at that interview that he reduced the policy from $100,000 to $50,000, and told Miss Amendt to take it down and deliver it to McElroy, and that Miss Amendt said that, when she presented the policy to McElroy, he said it was all right, except that he wanted the beneficiaries changed.

Upon this state of facts, the court refused to instruct the jury to return a verdict for the plaintiff in error, but charged them in effect (1) that if there was no completed contract to insure the life of McElroy before he was dangerously ill, on June 28, 1894, it was the duty of Miss Doty to inform the society of his illness, and if, by her conduct or words, she gave Tarbell to understand that McElroy was in good health, and in that belief he sent the policy to her, when he would not have done so if he had known the facts, the policy was fraudulently obtained, and there could be no recovery upon it; but that (2) if the society and McElroy had closed an agreement of insurance of the life of the latter before June 28th, and the delivery of the policy and payment of the premium were only the performance of that contract, the defendants in error might recover, notwithstanding the concealment of the fatal illness of McElroy.

There can be no doubt of the soundness of the first of these propositions, nor of the invalidity of the policy if the contract of insurance was not complete and binding upon both parties to it before Miss Doty appeared on the scene, on June 28, 1894. When she called for the policy, she knew that McElroy was dangerously ill, and had been sent to a hospital to undergo a serious operation. She had been instructed not to tell the officers of the society that he was sick, but she testified that she should not have done so if she had received no instructions. She therefore intended to conceal that fact from them in any event, because she knew, as every one knows, that the company would never have insured that life if it had known how plainly its end was approaching. She told Tarbell and Miss Amendt that McElroy was away; that he had left funds to pay the premium, and instructed her to do so and get the policy. The statement was one of those half truths that was far more dangerous and misleading than a downright falsehood, and it perfectly accomplished its purpose of deceit. She testified that she meant, not that McElroy was away from the city, but that he was away from his office. Why did she not say so? How different was the effect of the statement she made from that of the whole truth! How different from the effect of a plain statement of the facts that he was away from his office, at the hospital, where he was undergoing a critical surgical operation, to which he was compelled to submit by the virulence of an attack of appendicitis under which he was suffering, and that, in contemplation of that operation, he had called her to his bedside, signed blank checks, and instructed her not to tell the officers of this society that he was sick, but to pay the premium, and get a policy on his life! The sub-

ject-matter of this contract was the life of James E. McElroy. When these negotiations commenced, in May, 1894, he was 36 years old. His examination showed his life to be a first-class risk. The probabilities were that he would live more than 20 years, and that the society would receive for its $50,000 its semiannual premiums for 19 years. A sudden and fatal illness attacked him, and the probable length of his life was reduced to a few days, so that the probability was that the society would receive but $881.02 for its $50,000. The statements of Miss Doty that he was away, that he was in Boston, and that he would probably return by Chicago, her omission to tell that he was dangerously ill, and that he had signed blank checks in contemplation of a serious operation, that he was undergoing that operation, and that he had instructed her not to tell the officers of this society that he was sick, but to pay the premiums and get the policy, were respectively made and omitted for the purpose and with the intent of inducing this society to make this contract to pay $50,-000 for $881.02, in ignorance of the facts which made that result almost inevitable, and on the faith of the medical examination of May 10, 1894, and the previous good health of McElroy. They were intentionally made and omitted to cheat this society into making this contract and issuing its policy, and they did so; but they will receive no reward at the hands of any court.

Fraud vitiates all contracts. But misrepresentations or concealments of the facts relative to the health of those whose lives are insured are peculiarly fatal to contracts of life insurance, because the companies necessarily rely upon the statements and acts of the assured in making their contracts. Companies cannot know and surgeons cannot discover by the appearance and examination of subjects many insidious and often fatal diseases, the symptoms of which are felt by their victims. Hence the companies require them to answer many questions as to their habits, their health, their symptoms, the longevity of their ancestors, and the causes of their decease. When these have been answered, and the examining surgeon has certified to the good health of the subject and the character of the risk upon his life, these answers and this certificate become the basis of the contract. In other words, the honesty, good faith, and truthfulness of the person whose life is insured form the actual foundation of the agreement of life insurance. It is for this reason that contracts of life insurance are said to be uberrimæ fidei, and any material misrepresentation or concealment is fatal to them. When the representation of good health and the certificate of the surgeon have been made, and the contract is not immediately closed, but negotiations for it continue, and proposals and counter proposals are made, but for some time none are accepted, the representation and certificate continue and condition all the proposals and the ultimate contract, when it is closed. They are all made in reliance upon the continued truth of the representation and certificate, and in the belief that there has been no material change in the health or the probability of the continued life of the subject. The nature of this contract, the insurance of a man's life, the perfect familiarity of the man himself with

the condition of its subject-matter, his own life, the ignorance of the insurance company concerning it, and its necessary reliance in making the contract upon his good faith, honesty, and truthfulness, impose upon him the duty of disclosing to the company every fact material to the risk which comes to his knowledge at any time before the contract is finally closed. An intentional omission to discharge that duty perpetrates a plain fraud upon the company, which necessarily avoids the contract. The policy in this case cannot be sustained in the face of the intentional concealment by McElroy and his agent, Miss Doty, of the radical change in the condition of its subject-matter after the negotiations were commenced, and before they were closed,—from a condition of robust health and probable long life, upon which they were based and were proceeding, to one of dangerous illness, of a critical surgical operation, and of imminent death. The intentional concealment of this change, and the misleading representation of continued good health and actual business life, inflicted a flagrant fraud upon this company, which is fatal to the contract of insurance, unless it was completed before McElroy was attacked with appendicitis. Insurance Co. v. Wolff, 95 U. S. 326, 333; Insurance Co. v. Ewing, 92 U. S. 377, 380; Loewer v. Harris, 6 C. C. A. 394, 57 Fed. 368, 373; Dungan v. Insurance Co., 46 Md. 469, 498; Marshall v. Insurance Co., 58 N. Y. Super. Ct. 406, 11 N. Y. Supp. 700; Grand Lodge v. Cressey, 47 Ill. App. 616; Carter v. Boehm, 3 Burrows, 1905; Morrison v. Muspratt, 4 Bing. 60, 62; Huguenin v. Rayley, 6 Taunt. 186; Buny. Ins. (3d Ed.) 37, 38, 51, 52; Insurance Co. v. Lawrence, 2 Pet. 25, 49; McLanahan v. Insurance Co., 1 Pet. 170, 185; Nippolt v. Insurance Co., 57 Minn. 275, 278, 59 N. W. 191; Bates v. Hewitt, L. R. 2 Q. B. 595, 604; Tate v. Hyslop, 15 Q. B. Div. 368, 377; Blackburn v. Vigers, 12 App. Cas. 531. No valid contract of insurance, therefore, was made or closed after June 27, 1894, and the only question at the close of the trial was whether or not such a contract had been made before that day.

The society insisted, and still insists, that there was no evidence of such an agreement in the case; but the court instructed the jury, in effect, that they might conclude that there was such a contract if they found from the evidence (1) that prior to June 15, 1894, Tarbell and McElroy had agreed that the old policy for $100,000 should be reduced to $50,000, and revived for that amount; (2) that the difference between the contract to pay the $50,000 to Della Irene McElroy, Myrtle Beckham McElroy, and James Edward McElroy, Jr., which McElroy demanded on June 15, 1894, and the agreement to pay the $50,000 to James E. McElroy, his executors, administrators, and assigns, which he refused to take and pay the premium for on that day, "was a matter of no substance to the insurance company": (3) that Tarbell, when this proposed change in the contract was reported to him, assented to it by some overt act; and (4) that "the company would have so complied therewith prior to the last sickness of McElroy but for the inability of the clerk or secretary or other clerk of the company or some other business cause in the office obstructing to do so timely." In support of this charge it is insisted that con-

tracts of insurance may be made orally as well as in writing; that they may be based upon mutual promises on the one part to insure, and on the other to pay for the insurance; that the time for the payment of the premium may be extended or deferred by agreement; and that its payment at the fixed or usual time may be waived. But the question in this case is not so much what may be done as what was done. There is·no doubt that an oral contract of insurance may be made, but the custom of life insurance companies is to contract by written policies, and, until such a policy is delivered, the presumption is that there were negotiations, but no contract, and no intention to contract, before the delivery of the policy.

A company may make an oral contract of insurance without the payment of the premium, in consideration of the promise of the assured to pay it; but, in order to constitute such a contract, the company must agree to accept the promise of the assured, instead of its performance, as the consideration for the insurance. In the conduct of the business of insurance against fire in our cities such contracts are not uncommon. Indeed, it is quite customary for fire insurance companies to make their contracts, and to extend a short term of credit to the assured for their premiums. But no such custom exists in the conduct of the business of life insurance. The almost invariable custom there is for the companies to make no contract, and to incur no liability to insure the life of any man, until a premium has been paid. Accordingly, where no policy of life insurance has been issued, and no premium has been paid, there is a strong presumption that there was no contract, and no intention to contract, otherwise than by a policy made and delivered upon the simultaneous payment of a premium. Kendall's Adm'r v. Insurance Co., 10 U. S. App. 256, 2 C. C. A. 459, and 51 Fed. 689, 691; Heiman v. Insurance Co., 17 Minn. 153, 157 (Gil. 127); Markey v. Insurance Co., 103 Mass. 78; Hoyt v. Insurance Co., 98 Mass. 539, 543; Markey v. Insurance Co., 118 Mass. 178, 194; 1 May, Ins. (3d Ed.) § 56. A company may waive the payment of a premium when it is due, but the basis of·waiver is estoppel; and unless the company does or omits some act whereby the assured has just ground to believe, does believe, and acts on the belief, that the corporation will make, continue, or restore a contract without the payment of a premium, there is no estoppel, and there can be no waiver. Unsell v. Insurance Co., 32 Fed. 443, 445; Thompson v. Insurance Co., 104 U. S. 252, 261; Equitable Life Assur. Soc. v. Hietts' Adm'r, 19 U. S. App. 173, 185, 7 C. C. A. 359, and 58 Fed. 541; Beach, Ins. §§ 757, 758.

We come, then, to the consideration of the evidence of this oral contract, under the general presumption, based on the custom of the business of life insurance, that there was no contract of insurance, because there was no policy and no payment of premium. The circumstances surrounding this particular case raise the same presumption. If a contract of life insurance binds the insured to pay the stipulated premium, as counsel for the defendants in error contend, McElroy had once agreed to pay this society $1,669 annually for 20 years. But he had broken his contract. He had made default in his

second payment. The society had extended the time for its payment 30 days, but his default continued. He begged for a further extension, but the society refused to give it, and the policy for $100,000 lapsed on January 30, 1894. If the plaintiff in error was willing to promise to insure McElroy for his promise to pay premiums, here was its opportunity. It declined it, and it is almost incredible 'that after this refusal it would make a contract to insure his life for $50,000 in consideration of the bare promise of one who had already made default in his obligations to pay the new premiums at some indefinite time in the future. Thus, the general presumption that there was no oral contract is seconded by a strong presumption to the same effect from the circumstances surrounding the case. The defendants in error were called upon to produce clear and convincing proof to overcome these presumptions.

Much stress is laid in the argument upon the fact that the policy in suit was called by the witnesses, and is, in effect, the old policy for $100,000 reduced 50 per cent., and restored with a change of beneficiaries and of amounts and times of payment of the installments of premium. But the fact remains that it evidences a new contract of insurance, which did not exist between January 30, 1894, and May 8, 1894, and which could not be brought into existence without a new agreement of the parties. The question here is whether or not there is any evidence that such an agreement was made before June 28, 1894, and it is immaterial to that issue whether it was to be evidenced by a new policy or a restored policy. A new contract was essential to the insurance of the life of McElroy by either method, and we have searched this record in vain to discover some evidence that these parties made or intended to make such a contract without a delivery of a policy and the simultaneous payment of the premium. On the other hand, the contract relations between McElroy and the society ceased on January 30, 1894. Tarbell repeatedly solicited him to restore the old policy, and he repeatedly declined. He finally induced him to return his old policy, and to submit to a medical examination, by the assurance that taking the examination would put him under no obligation to take any insurance. On June 13 or 14, 1894, when he returned his old policy, Tarbell urged him to give his check then for the first premium on the new policy, and let him put his insurance into effect; but he refused to do so, and declared that he was not ready to determine the matter definitely; and when Tarbell told him he would have the old policy reduced to $50,000, and bring it down to him, he replied that he would discuss the matter then. The new policy, when written, recited that it was made in consideration "of the payment in advance of $434, and of the semiannual payment of $434 * * * on or before the 30th day of June and December in every year during the continuance of the contract." Tarbell directed Miss Amendt to deliver this policy only upon payment of the $434 in advance. She told McElroy she was so instructed when she presented the policy and Tarbell's letter to him on June 15th, and in that letter Tarbell wrote him, "Kindly give her your check for the same, $434, and she will have a renewal receipt sent to

you." McElroy rejected the policy, refused to pay the premium, and declared that he wanted the beneficiaries changed from himself, his executors, administrators, and assigns, to the defendants in error. Miss Amendt took the policy back to the society, to see if she could have this change made, and there the negotiations rested until Miss Doty appeared, on June 28th, with her story of McElroy's absence and her request for the policy. This evidence is undisputed, and it seems to us to show that there was no contract to insure, and no intention to make any such contract until the premium was paid. The parties themselves were evidently of this opinion at the time. McElroy thought so, or he would not have told Miss Doty to conceal his illness, pay the premium, and get the policy on June 28th. Miss Doty thought so, or she would not have concealed his sickness, and declared that he was away, that he was in Boston, and would probably return by Chicago, while she was procuring the policy and paying the premiums. And Tarbell and Miss Amendt thought so, or they would not have made the simultaneous receipt of the first installment of the premium a condition precedent to the delivery of each of the policies. The result is that the general presumption based on the custom of the business of life insurance, the presumption from the circumstances of this particular case, the terms of the policy tendered, the construction placed upon the transaction by the parties to it at the time, and the undisputed evidence, all tend to show that there was no contract to insure the life of McElroy, and no intention to make such a contract, before the premium was paid and a policy was delivered, on June 29, 1894, and there is no evidence to the contrary.

Nor is there any evidence of any waiver in this case. The basis of waiver, as we have said, is estoppel or acts from which the contracting party may legitimately infer a waiver. But the society did nothing and said nothing whereby McElroy had any ground to believe, and it did nothing that induced him to believe, that his life was or would be insured without the simultaneous payment of a premium and the delivery of a policy. On the other hand, it forfeited his former policy on account of his failure to pay the premium. It requested him to pay the first premium on the new policy on June 13th or 14th, when he handed back his old policy, and notified him that this payment was necessary to enable Tarbell to put his insurance into effect. On June 15th it declared to him, by the recital in the policy tendered, by letter, and by the statement of Miss Amendt, that the payment of the premium was a condition precedent to the delivery of the policy and the closing of the contract. Look at the case in any aspect, and there is no evidence in it which warrants a finding that there was before June 29, 1894, any contract between these parties or any waiver by the plaintiff in error of its right to refuse to make such a contract; and the court should have instructed the jury to return a verdict in favor of the society. It is the duty of the trial court to direct a verdict in favor of the party who is clearly entitled to it, where the evidence is such that a verdict for his opponent must be set aside by the court. Railway Co. v. Davis, 10 U. S. App. 422, 3 C. C. A. 429, and 53 Fed. 61; Gowen v. Harley, 12 U. S. App. 574,

585, 6 C. C. A. 190, 197, and 56 Fed. 973, 980; Railway Co. v. Moseley, 12 U. S. App. 601, 604, 6 C. C. A. 641, 643, and 57 Fed. 921, 922; Reynolds v. Railway Co., 32 U. S. App. 577, 16 C. C. A. 435, 437, 438, and 69 Fed. 808, 810; Motey v. Granite Co., 36 U. S. App. 682, 20 C. C. A. 366, and 74 Fed. 155, 157.

Moreover, we are not prepared to concede the proposition contained in the charge of the court below that it was the province of the jury to hold this society bound by the contract with Della Irene McElroy, Myrtle Beckham McElroy, and James Edward McElroy, Jr., if they were of the opinion that the difference between that contract and its proposed agreement with "McElroy, his executors, administrators, and assigns," which McElroy rejected, "was of no substance to the company." The subject-matter of a policy of life insurance is the life insured. The parties to it are the insurance company, on the one hand, and the beneficiaries, on the other. The parties to a contract are as important as the subject-matter, and parties cannot be imported or substituted upon one side of a contract without the consent of those on the other. Bank v. Hall, 101 U. S. 43, 51; Ferdon v. Canfield, 104 N. Y. 139, 142, 10 N. E. 146; Thomas v. Thomas, 60 Hun, 382, 383, 15 N. Y. Supp. 15; McElwee v. Insurance Co., 47 Fed. 798. The question at issue was not what contracts, other than that it offered, the society might have made without more damage to itself, but what contract it in fact made. It offered to make a contract with McElroy, his executors, administrators, and assigns, to insure his life on certain conditions. It is true that McElroy might have accepted that contract, and then have assigned it to the defendants in error; but he did not, and the proposition cannot be entertained for a moment that a court or a jury may bind the proposer of a rejected contract to an agreement of the same terms with any parties to whom the rejected contract might have been assigned, if, in their opinion, the difference between the agreements is of no substance to the proposer. Courts and juries cannot make contracts for the litigants before them. Every party has the right to make or to refuse to make the contracts offered to him, and the exercise of that right is not limited by the soundness of the reasons which induce him to act. If he proposes an agreement, and it is rejected, and a modified contract is offered to him, he has the absolute right to accept or reject the counter proposition, either with or without reason, and whether the difference between the two propositions seems to a jury to be material or immaterial. He has the right to determine that question for himself. The rejection of his first proposition leaves him under no obligation to make any contract. It leaves him free to refuse to make even the original contract which he offered, and free to refuse to make every other contract proposed to him. These propositions are fundamental in the law of contracts; and it follows that when McElroy refused to pay the premium on and rejected the policy tendered to him by the plaintiff in error on June 15, 1894, and demanded a change in the beneficiaries, he left the society entirely free to make or to refuse to make any contract relative to his life, whether the difference between the two proposed contracts ap-

peared to the jury to be of substance or of shadow. No one but the society itself could so determine and act upon that question as to bind it by an agreement. Eliason v. Henshaw, 4 Wheat, 225, 229, 230; Carr v. Duval, 14 Pet. 77, 82; Kleinhans v. Jones, 15 C. C. A. 644, 68 Fed. 742, 749.

Nor can we sanction the instruction that if the jury found that after Miss Amendt communicated to Tarbell the fact that McElroy refused to take the policy tendered to him on June 15th and wanted the beneficiaries changed, and before June 28, 1894, he assented to the change by some overt act, and the company would have complied with McElroy's wishes prior to the last sickness of McElroy but for the sickness or inability of some clerk or servant or some other business cause, then they might find the existence of the contract before the illness of McElroy. We have searched this record in vain for the evidence of any overt act of Tarbell which signified his assent to the new proposal of McElroy before Miss Doty came, on June 28th, to ask for the policy. It is error to charge the jury upon an assumed state of facts to which no evidence applies, because it withdraws their attention from the real issues on trial, and tends to fix it upon issues that are not presented by the case. Insurance Co. v. Stevens, 36 U. S. App. 401, 18 C. C. A. 107, and 71 Fed. 258; Railroad Co. v. Houston, 95 U. S. 703; Railroad Co. v. Blessing, 14 C. C. A. 394, 67 Fed. 277, 281; Railway Co. v. Spencer, 36 U. S. App. 229, 18 C. C. A. 114, 115, and 71 Fed. 93, 94. Moreover, delay in rejecting or accepting a proposal does not make a contract. No acceptance of McElroy's counter proposition appears to have been made, and it is certain that no notice of such an acceptance was ever given to him before his fatal illness. Even if the proposition was accepted, still there was no contract, because no notice of the acceptance had been given. The acceptance of an offer not communicated to the proposer does not make a contract. Kendall's Adm'r v. Insurance Co., 10 U. S. App. 256, 2 C. C. A. 459, and 51 Fed. 689, 693; Jenness v. Iron Co., 53 Me. 20, 23; McCulloch v. Insurance Co., 1 Pick. 278; Thayer v. Insurance Co., 10 Pick. 325, 331; Borland v. Guffey, 1 Grant, Cas. 394; Beckwith v. Cheever, 21 N. H. 41, 44; Duncan v. Heller, 13 S. C. 94, 96; White v. Corlies, 46 N. Y. 467. The judgment below must be reversed, with costs, and the case must be remanded to the court below, with instructions to grant a new trial; and it is so ordered.

CALDWELL, Circuit Judge (dissenting). The opinion of the court lays down propositions to which I cannot yield my assent. There is no rule of law which declares that every man is perfectly familiar with his health and physical condition. Many men are afflicted with fatal maladies who are profoundly ignorant of the fact. It is not the invariable practice of insurance companies to refuse to issue a policy until the premium has been paid; credit is frequently given. If the contract of insurance was complete before the evidence of the contract—the policy—was delivered, and before the sickness and death of the insured, it is immaterial what was said and done by the insured's stenographer at or before the time of the delivery of the

policy and the payment of the premium. Nothing she said or did could affect the validity and binding force of the previously completed contract, if one existed. The question of fact whether there was a completed and binding contract for insurance prior to the delivery of the policy and the payment of the premium was submitted to the jury upon voluminous and conflicting testimony, under instructions which are not subject to any just exceptions. The jury found there was such a contract. This verdict of the jury is overthrown by the court on the strength of presumptions which are unknown to the law. There is no presumption of law that all contracts for insurance are in writing. It is well settled that a verbal contract of insurance is not within the statute of frauds, and that it is as binding and effectual as a written one; and in a suit upon such a contract the rule of evidence is the same that it is in a suit upon any other lawful contract, viz. the party setting it up must prove it by a preponderance of the evidence. The plaintiffs in this case discharged all the burden imposed upon them by the law when they proved the contract to the satisfaction of the jury. The law raised no presumptions against them or the weight of the evidence. The exact nature of the "presumption" relied on as one of the grounds for setting aside the verdict of the jury is not defined by the court. Whether it is one of fact or one of law, and whether it is conclusive or may be rebutted, and, if open to rebuttal, the nature and degree of the evidence required to overthrow it, are questions not discussed in the opinion of the court. If the policy was not delivered, and the premium was not paid, before the sickness or death of the insured, these facts did not preclude the plaintiffs from showing, as they did to the satisfaction of the jury, that there was a valid verbal contract for the insurance, and that time was given for the payment of the premium; and, as the insurance might lawfully have been effected in this way, there is no presumption of law that it was not so done. Lisbon v. Lyman, 49 N. H. 553. To hold otherwise is to confound the distinction between facts and circumstances and presumptions.