# MERCEDES RIVERA ET AL., Plffs.,

*v.*

# SUN LIFE ASSURANCE COMPANY, Dft.

San Juan, Law, No. 498.

Statement: Insured, having defaulted in the payment of his premiums, was advised by the company, by letters, of the amount of the payment which it would be necessary for him to make to revive the policy and carry it forward to a future date. Subsequently, but before the date indicated, insured paid the amount and something over, and was re-examined by the company's physician, and passed. The general agents of the company gave him an unconditional receipt for the money paid. Insured died within a month, and before the main office in Canada had notice of the payment and re-examination. Held:

1. That the company, by its general course of action, had waived the forfeiture of the policy for nonpayment of the premiums when due, according to the conditions of the policy.

2. That, the agents having given to the insured an unconditional receipt for the payment, the company was bound thereby.

3. That such a company is responsible for the acts of its agents within the general scope of their authority, the insured not having knowledge of the limitations on such authority.

4. That the company, with knowledge of the act of forfeiture, having unconditionally assessed and collected a premium, thereby waived the forfeiture.

5. An agreement to accept, at a future time, an overdue premium, is a waiver of any forfeiture.

Opinion filed February 8, 1908.

Note.—*Life insurance.*—As to forfeiture of policy for nonpayment of premiums, waiver, see note to Thompson v. Knickerbocker L. Ins. Co. 26 L. ed. U. S. 765.

Rivera v. Sun Life Assurance Co.

*Mr. C. Coll y Cuchí,* attorney. for plaintiffs.

*Mr. Thomas D. Mott, Jr.,* attorney for defendant.

RODEY, Judge, delivered the following opinion:

This is an action at law to recover on a life insurance policy, by the mother of two minor children, for whose benefit the contract was entered into by the father. The defendant filed a general denial. Counsel for defendant filed no brief. A jury was waived and the cause was tried before the court alone. The stenographer's notes of the evidence have been transcribed, and now, after having read the same and examined the exhibits, we state:

The facts of the case are as follows: On the 20th of March, 1903, José Antonio Ramirez y Valero, the father of these two minor children, entered into the contract and had a policy, No. 106,653, for the sum of $3,000 issued to him, and payable, in case of his death, to his two children. The semiannual premium was $55.50, payable on the 1st of February and August of each year. The policy contains the usual stipulations as to certain options, privileges, apportionment, dividends, extension of time, incontestability after two years, cash surrender or transfer value, loans on the policy, etc., etc. The defendant is a Canadian corporation having its headquarters in the city of Montreal, but probably, because of doing business in Porto Rico and in other Spanish-speaking countries, it has prepared a form of policy in Spanish for use here, and the policy in question is in that language. It does its business in Porto Rico through a firm named Gandia & Stubbe, who are its general agents. The insured, according to a little statement introduced in evidence, paid five semiannual payments of $55.50, the last one being in

Rivera v. Sun Life Assurance Co.

February, 1905. From all that we can gather from the evidence, neither these agents nor the company were very strict about the payment of the premiums on the exact dates they became due. In fact, the policy itself grants certain rights in that regard before it would become forfeited.

On October 1, 1906, the company wrote a letter to the insured from its head office in Montreal, which presumably, from the company's point of view, shows the condition of affairs on that date. Leaving out formal portions, it is as follows:

"Permit me to draw your attention to the fact that your assurance in this company under the above policy has lapsed, the debt under same having exceeded its value.

"We would remind you how important it is that you have adequate life assurance protection, and will be pleased to hear from you with a view to a revival of your policy. A revival of this policy is more to your advantage than new assurance.

"Should you feel disposed to renew your assurance we feel confident that we can come to some satisfactory terms whereby the debt may be paid off in easy instalments. Any information along this line will be cheerfully furnished."

It appears that the insured must have answered that letter on the 25th of that month, for on November 17th, following, in that same year, the company wrote him another letter, also from Montreal, which, in like manner, after leaving out formal portions, is as follows:

"We are favored with your communication of the 25th ult. We regret very much to find that your policy has been canceled. We endeavored to persuade you to continue it in force before it lapsed; but, according to your letter, your financial circumstances were disappointing at the time. We, however, are very pleased that you feel yourself now in a position to resume pay-

III. Porto Rico—23.

ments. Our rule for reviving policies is to secure satisfactory evidence of good health, and a payment of at least an amount sufficient to continue the policy for some time.

"In your case, the amount which we would require would be $100.00,—this on account of the indebtedness against the policy. This would enable us to continue the policy until August next. Of course, if you feel yourself in a position to pay off all the indebtedness, it would be more to your advantage. We are communicating with our representatives in your island, Messrs. Gandia & Stubbe, of San Juan, who will provide the forms and give you what further instructions may be necessary for a revival of the policy."

It seems that the insured did not immediately do anything about the matter, and therefore, on the 30th of that same month (November, 1906), the agents here wrote him a short note in Spanish, a translation of which is as follows:

San Juan, November 30, 1906.

Mr. Antonio Ramirez,

Hotel America,

San Juan, P. R.

Dear sir and friend:—

We have written to you several times in regard to your policy without having received any reply. To-day the company writes to you in answer to one of yours, and we beg you to come over to this office, to see whether we can arrange in such manner that you do not lose your policy.

Expecting to see you, we remain

Your friends and obedient servants,

Gandia & Stubbe.

It also appears from the evidence that the insured was a poor

Rivera v. Sun Life Assurance Co.

man, and, although he desired insurance, could not always manage to pay the premiums; and further, that there probably was considerable importuning on the part of these agents indulged in trying to get him to keep his premiums paid, and he had more or less conversations about it with them from time to time.

It will be noticed that in the company's letter of November 17th above, notwithstanding they claimed to have canceled his policy, still they told him that the amount they would require in order to enable them to continue his policy until the 1st of August, 1907, would be $100. The insured, it appears, could not raise the money at that time, nor until the 18th day of June, 1907, following, when he went to the agents of the company, Gandia & Stubbe, and paid them $111, they giving him a receipt for it on one of their own printed forms, reading as follows:

No. 2.                                                              $111.
    Recibimos de **Sr. D. J. A.** Ramirez y Valero la cantidad de ciento once dollars que abonamos a/ct.
               San **Juan, P. R.** 18 de Junio de 1907.
                       Gandia & Stubbe,

*(margin, vertical:)* Gandia & Stubbe

Which receipt, translated, is as follows:

We have received of Sr. D. J. A. Ramirez y Valero the sum of $111, which we credit on account.
San Juan, P. R., June 18, 1907.
                       Gandia & Stubbe.

It developed in the evidence that the insured owed this firm of agents nothing, and it affirmatively appears that this money

was intended as a payment on this policy, in response to the letter of November 17th, aforesaid, and that the $11 were added to the payment because the agents told him that, as another premium period had passed, he ought to pay something more, notwithstanding the statement in the letter of November 17th, 1906, that the sum of $100, if paid, would enable them to continue the policy until August, 1907.

It cannot be determined beyond doubt from the evidence whether the insured had, previous to the payment of this $111 to the agents, submitted to an examination by their physician as to his continued good health, and filed an application or something of the sort to continue, revive, or renew his said policy, but it is in evidence that he did so either before, at, or shortly after that time. As shown by the burial permit, the insured died on the 18th of July, 1907, or exactly one month after the date of the receipt by the agents of this $111 from him, and it is stated that he died of cerebral congestion,—a disease, as it is said, that could come upon a person in a very short time and result fatally, as it certainly did in this case, because the company's physician found him in good health when he examined him. One of the agents, Mr. Pedro Gandia Cordova, testified that the insured died when the boat was two days out of San Juan on its way north to New York, carrying the report of the agents about the matter to the head office of the company at Montreal, Canada.

This agent, Mr. Gandia, testified pretty fluently in the case, and stated that the deceased came to his office in the early part of June, learned all about the procedure necessary to revive his policy, and that he, the witness, explained the whole matter to him and told him he would have to make out a new application, which would have to be sent to headquarters in Montreal, and

Rivera v. Sun Life Assurance Co.

that, if it was accepted, they would forward the renewal or revival receipt to him, the witness, to be delivered to the insured. He also testified that the insured wanted to pay him the money, but that he refused to receive it, but that the insured importuned him so that he finally agreed to receive it as a deposit for him, etc., etc., but that it was intended to apply on this insurance policy when the company accepted the new application, etc.

While this man was testifying, we realized the hard position in which the widow and children plaintiffs are put. The husband and father being dead, they are utterly helpless to contradict his statements in any way. In most states they have statutes going to the extent, at least, that no one can recover against the estate of a deceased person on his own uncorroborated oral testimony, the law considering that, when the lips of the party whose estate is to be affected are sealed in death, something more than an uncorroborated oral statement against his interest ought to be required. We are aware, of course, that this is hardly that sort of a case, as the effort here is to collect for the estate; but still there is some analogy, and the local civil code provides—Session Laws 1905, p. 101, § 162—that the effect of evidence is not arbitrary, but is to be exercised with legal discretion, etc., and that the court or jury need not decide in conformity with the declarations of any number of witnesses if they do not produce conviction in their minds, against a less number, or against a presumption or other evidence satisfying its mind. That the proof must be estimated not only according to the evidence which it is in the power of one side to produce and on the other to contradict, etc. We cannot imagine what induced these agents to keep this man's money from the 18th of June, when they unquestionably received it, up to the

16th of July, when they say they sent out the application, unless it was that the insured had not in fact submitted to the medical examination, and signed this new application right away after paying the money.

The question to be decided is whether or not the circumstances, as here related, are sufficient to show the liability of the defendant company. The agent referred to testified that the company has rules, and that such rules require that revival of a forfeited policy can only be brought about by the submitting of a new application on the company's own blank form, and on a certificate of continued good health of the insured, and the receipt of both of these instruments and their approval at the head office of the company, in Montreal, Canada, and the sending back of a receipt of some sort, and its actual delivery to the insured. Save for the evidence of this agent, who, of course, presumably is as much interested in defeating recovery as the company it self is, there is nothing to show that any knowledge of these rules was brought home to the insured, who was a somewhat ignorant and poor man. The policy itself contains absolutely nothing on that subject, except the phrase in § 2, under the head of "Privileges,"—"an extension of thirty days is granted for the payment of premiums of renewal."

Of course, the policy contained the usual notice printed on the bottom of the outside face of it after it is folded, in print so small that one would almost require the use of a magnifying glass to see it, that no person except the officers of the company shall have power to vary the contract, or extend the time to pay premiums, or bind the company in any way by any promise, offer, admission, or statement not set forth in the application, and that no payment should bind unless in exchange for an official receipt, etc., and that the insurance should not take effect

until the payment of the first premium thereunder. It is doubt-ful if this relatively ignorant man ever even saw this notice, and it is not in evidence even that he could read well enough to un-derstand it. At any rate, he had pretty good reason to believe from the course of dealing had with this company, both directly, with the office at Montreal, and with the general agents here, that they were not themselves living strictly up to the require-ments of their contract.

The Supreme Court of the United States has repeatedly held that forfeitures of policies of insurance are not favored in law, but that, when a forfeiture has taken place, courts will, of course, not hesitate to so hold. Hartford Life Annuity Ins. Co. v. Unsell, 144 U. S. 439, 36 L. ed. 496, 12 Sup. Ct. Rep. 671; Nederland L. Ins. Co. v. Meinert, 199 U. S. 171, 50 L. ed. 139, 26 Sup. Ct. Rep. 15. By implication, the converse of this rule, that revivals are favored, would no doubt be held by that court.

It is also held in many cases that, where the course of deal-ing between the insurance company and the insured leads the latter to believe that they have waived conditions as to prompt payment of premiums, or as to cancelations or forfeitures, the same can be considered, in proper cases, and under proper cir-cumstances and proofs, as having taken place.

Under the terms of the policy, we are not sure that the com-pany had in law the right to forfeit the policy and cancel it at the time, and as stated in their communications to the in-sured of October 1st and November 17, 1906, aforesaid. It must not be forgotten that in the latter communication they stated to him: "Our rule for reviving policies is to secure a satisfactory evidence of good health and a payment of at least an amount sufficient to continue the policy for some time.

Rivera v. Sun Life Assurance Co.

In your case the amount which we would require would be $100,—this on account of the indebtedness against the policy. This would enable us to continue the policy until August next. Of course, if you feel yourself in a position to pay off all the indebtedness, it will be more to your advantage. We are communicating with our representatives in your island, Messrs. Gandia & Stubbe, in San Juan, who will provide the forms, giving you what further instructions may be necessary for a revival of the policy."

Now, in response to that letter, and a further importuning letter from the agents, thirteen days later, on November 30th, and, no doubt, in response to several conversations had with the agents in the meantime, the insured, on June 18th, went to the representatives of the company here in San Juan, where he and they both lived, and from whom he had secured the policy in the first instance, and paid them more money than he was actually required at that time to pay if his object was simply to keep the policy alive, because, with the payment of only a hundred dollars, it would be continued to the following August. He also furnished them the only other thing their letter asked him to furnish; that is, a certificate of continuing good health. This latter was furnished them by their own physician, after he had examined the insured for that purpose, and which, it may be presumed, he would not have done if the insured was not in fact in good health.

Let us not forget that the company did not have to issue any new policy. The old contract and the old policy were to be sufficient in that regard; and, as stated, it is not even certain, under the course of dealing of the parties, the terms of the policy, and the law, that the policy has ever been legally canceled. Then why should this man be without insurance for probably

Rivera v. Sun Life Assurance Co.

sixty days, until these agents, at their own convenience, should send this certificate and this application off to a foreign city a couple of thousand miles away, and then have to wait until the certificate came back again, especially when it is not in evidence, at least not in such a forcible way as to induce the court to accept it, that the insured in fact knew that this application and this medical certificate had to go through this tedious process before his insurance would be effective?

These men were general agents of the company here, presumably with full power to make all sorts of bargains with people they insured, and of necessity this had to be so with the headquarters so far away. Let us not forget that this company is a Canadian corporation with its headquarters in a foreign country probably 2,000 miles away, and with nearly all of its literature printed in English.

After a considerable examination of the authorities, we are inclined to believe that, under the law, such agents have large powers, and, unless their statements are duly borne out by corroborating circumstances, they ought not to be given too great weight against the claims of the heirs of dead men. If this money was in fact received as a mere deposit from the insured, the receipt could have so stated. The agent who testified is a very intelligent man, and knew well the contract rights of the company. Is it not probable that, if he had put the real fact in that receipt, that the insurance would not be in force for maybe several months thereafter, the insured would not have paid it to him? The books are full of cases where recovery is had where circumstances and facts were not as favorable to claimants as here. We haven't time to classify them, but the following are some of the authorities we have consulted in our examination of the law more or less applicable to this sort of a

case, most of them being cited not that they are on all fours
with the facts and circumstances here, but on account of the
general bearing they have as to such controversies.

Joyce on Insurance, vol. 1, § 540, where it was held: "If
it be conceded, as it must be, that an agent has power to waive
conditions, then, in the absence of known restrictions upon his
authority, such waiver may be made by parol. The oral waiver
need not necessarily be an actual agreement, but may arise
from statements made by the agent from which a waiver may be
inferred [citing cases]. So it is held in Kansas that a general
agent may modify the written contract, or waive conditions
therein, by parol, notwithstanding restrictions upon the agent's
powers in the policy."

Id. vol. 2, § 1370, where it was held that "if with knowledge
of an act of forfeiture an insurance company makes and collects
assessments on premium notes, the forfeiture of the policy is
thereby waived."

We find in 25 Cyc. Law & Proc. p. 714, § 3, this language
used: "Unless it is stipulated that the insurance shall not take
effect until delivery of the policy, there may be a binding con-
tract of insurance on the acceptance by the company of the ap-
plication, or on delivery of the application to the agent and its
acceptance by him, when he has authority, express or apparent,
to make a binding contract," etc.

Also at p. 870 it is stated that "the acceptance of a premium
or assessment is a waiver of forfeiture on account of a default
in not paying it in due time. . . . A default is also waived
by receiving subsequent premiums or assessments from a de-
linquent policy holder. Indeed, a demand of a premium or
assessment on account of which a forfeiture might be claimed,

or an attempt to collect it, is a waiver of the forfeiture, for it is a recognition of the continuance of the contract."

Of course, in all of these cases it is held that the acceptance of a premium or assessment, in order to constitute a waiver of a default, must be unconditional, as we think the acceptance by these agents of the money and the physician's certificate here was.

In Murray v. Home Ben. Life Asso. 90 Cal. 402, 25 Am. St. Rep. 133, 27 Pac. 309, it was held that "if an insurance company, after knowledge of any default for which it might terminate the contract of insurance, enters into negotiations or transactions with the assured which recognize the continued validity of the policy, and treat it as still in force, the right to claim a forfeiture for such previous default is waived. An agreement to accept, at a future time, an overdue premium . . . is a waiver of any forfeiture." This case also sustains the rule that forfeitures are not favored in law.

In Knarston v. Manhattan L. Ins. Co. 124 Cal. 74, 56 Pac. 773, it was held that "a general agent may waive a forfeiture for nonpayment of premiums by extending the time of their payment, in the absence of knowledge by insured that the agent has no such authority."

See also Denver L. Ins. Co. v. Crane, 19 Colo. App. 191, 73 Pac. 875.

The Supreme Court of the United States, in Union Mut. L. Ins. Co. v. Wilkinson, 13 Wall. 222, 20 L. ed. 617, held that "insurance companies who do business by agencies at a distance from their principal place of business are responsible for the acts of the agent within the general scope of the business intrusted to his care, and no limitations of his authority will

be binding on parties with whom he deals which are not brought to their knowledge."

See also Mutual Ben. L. Ins. Co. v. Higginbotham, 95 U. S. 380, 24 L. ed. 499; Southern L. Ins. Co. v. McCain, 96 U. S. 84, 24 L. ed. 653; Knickerbocker L. Ins. Co. v. Norton, 96 U. S. 234, 24 L. ed. 689; New York L. Ins. Co. v. Eggleston, 96 U. S. 572, 24 L. ed. 841. In this latter case it was held that "any agreement, declaration, or course of action on the part of an insurance company, which leads a party insured honestly to believe that, by conforming thereto, a forfeiture of his policy will not be incurred, followed by due conformity on his part, will estop the company from insisting upon the forfeiture, though it might be claimed under the express letter of the contract." This case is a very instructive one because, as in the case at bar, several letters passed between the assured and the headquarters of the company, independent of the agents, which the court held to have waived the strict provisions of the policy. It must not be forgotten that the policy here is a very plain one, and has practically none of the carefully drawn provisions of the New York standard policies.

We have examined the somewhat carefully argued case of Equitable Life Assur. Soc. v. McElroy, 28 C. C. A. 365, 49 U. S. App. 548, 83 Fed. 631, and, to our mind, the dissenting opinion of Caldwell, Circuit Judge, is the better law; and, as it is largely germain here, we cite it to show that it has not escaped our attention.

The defendant company here, as stated at the outset, filed only a general denial. We have no knowledge what it did with the medical certificate and the application sent to it, except that we presume it approved both if it ever in fact received them, and that it received the money paid by the insured, as stated,

Rivera v. Sun Life Assurance Co.

and that it went into its treasury. There is no evidence here that it ever tendered it back or any part of it. It could not keep this money, which it claims was intended for a revival of the policy, and apply it or any part of it on an old indebtedness of the policy, unless it thereby confesses that the policy was never forfeited or was revived.

Under all the circumstances of this case, we feel fully warranted in finding for the plaintiffs, which we hereby do, and a judgment will therefore be entered in their favor for the sum of twenty-eight hundred and eighty-nine dollars ($2,889), being the full amount of the policy, less the sum of one hundred and eleven dollars ($111) which we find from the statement introduced in evidence was the amount that remained due and in arrear after the last payment made by the deceased, as aforesaid; and it is so ordered.